H. J. LANEY v. BOARD OF PUBLIC INSTRUCTION FOR THE COUNTY OF ORANGE, STATE OF FLORIDA, a corporate body, and J. ROSCOE HOLBROCK, Chairman, and IRA J. JOHNSTON and JULIAN SADLER, the other two members of, and all three of said persons constituting the Board of Public Instruction of the County of Orange, State of Florida; and JUDSON B. WALKER, as Superintendent of Public Instruction of Orange County, Florida, and as Secretary of said Board.

15 So. (2nd) 748                                     June Term, 1943
November 30, 1943                                      Division B

*G. P. Garrett,* for appellant.

*Fishback & Smith, H. H. Wells* and *Weldon G. Starry,* for appellees.

BROWN, J.:

On July 7, 1941, the Trustees of Special School District No. 3 of Orange County, Florida, filed with the Board of Public Instruction of said County seven charges in writing which are set forth in full in the opinion written for the court by Mr. Chief Justice BUFORD when this case was before us on the first appeal. See Laney v. Holbrock, et al., in 150 Fla. 622, 8 So. (2nd) 465. These charges were preferred under Sections 3 to 7 of Chapter 18743, Special Acts of 1937, Vol. 2, page 1142, known as the Orange County Teacher Tenure Act, which Act became effective on May 24, 1937. H. J. Laney was tried by said Board on these charges on July 23, 24 and 25, 1941. The testimony taken on said hearing fills some four volumes of the present transcript. On July 25, 1941, said Board rendered a general verdict against Mr. Laney, finding him guilty as charged in each of the seven charges, and discharging him from his employment as principal of the Apopka schools and as a teacher in the Orange County Public school system.

Under the provisions of said statute, the appellant here took certiorari to the circuit court, which affirmed the finding and order of the Board, whereupon Mr. Laney sought review of said judgment of affirmance by certiorari to this Court. We held that certiorari did not lie from the circuit court judgment but that appeal would lie. Thereupon, Laney sued out an appeal from said order or judgment of the circuit court and on May 26, 1942, we reversed the judgment of the circuit court with directions to quash the order of the County Board of Public Instructions and remand the cause to said Board with instructions to make findings of fact with sufficient definiteness to advise the accused as to what facts the Board found sufficiently proven to substantiate charges which would warrant the forfeiture of Laney's position. Pursuant to the mandate of this Court the circuit court reversed its former order and instructed the Board to revise its findings. Thereupon the Board on August 6, 1942, rendered certain revised findings, which in the opinion of Laney and his counsel did not conform to the mandate of this Court. Thereupon Laney sued out a new petition for certiorari to the circuit court and

the same coming on to be heard before the circuit judge, he rendered an order on October 17, 1942, affirming said revised findings. From this order this appeal was taken. In the course of the proceedings in the circuit court on the second writ of certiorari to that Court, Laney made a motion to incorporate in the record the evidence taken before said Board. This motion was granted in the Court's order from which this appeal was taken.

The first charge against Laney was: "That H. J. Laney, on or about January 13, 1941, in Orange County, Florida, indulged in the use of intoxicating liquors."

In its revised findings, the Board found that Laney was guilty of this charge, and that his indulgence was of such an extent as to interfere with his usefulness as a teacher in the public schools of Orange County, and that his conduct during his said indulgence was such as to bring the character of said Laney for sobriety in to disrepute in Orange County.

In its findings the Board stated briefly the testimony of two witnesses, whose testimony the Board said that it believed to be true. The testimony of a large number of witnesses was taken with reference to this charge, and without attempting to summarize it, our judgment is that after a careful reading of all said testimony, there is no substantial evidence of the appellant's guilt. It is true that appellant was involved in an automobile collision on the highway between Orlando and Apopka on the night of January 13th, in which his car was overturned, and that a jug of sweet wine, which he bought and was taking to his father at his father's request, was broken and the contents thrown all over appellant and inside of his car. The overwhelming weight of the evidence in this case shows that appellant had not indulged in the use of any intoxicants of any kind that night and that he was perfectly sober when the officers, at his request by telephone came out and investigated the accident. The presence of wine on appellant's clothes was sufficient to create the impression of the two witnesses relied on by the Board that appellant had been drinking; this together with the fact that appellant was dazed for some moments by a hard lick on the head which he had received when his car turned over.

The second and third charges alleged that appellant during the school term from September to December 1940 indulged in the use of intoxicating liquors and on divers occasions during said period of time came to the high school and elementary school in Apopka during school hours and during such indulgence.

The third charge was a counter-part of the second charge except that the third charge covered the school term from January to June 1941. In support of these two charges the Board relied upon the testimony of two of the lady teachers in said school who testified that very frequently they smelled liquor on the breath of Mr. Laney during school hours, especially during the early morning hours of school. Mr. Laney's wife testified that he never took a drink of any kind of intoxicating liquor before going to school in the morning, and the school girl that the Laneys picked up and took with them to school every morning testified that he never drank in the car and that he never smelled of liquor. Numerous witnesses who had business with him or saw him during the morning hours of school testified that they never detected any smell of liquor. In fact, this testimony was refuted by the testimony of other teachers and students and other persons whom he saw nearly every morning, some twelve or fourteen witnesses in all. And indeed the two ladies upon whose testimony the Board based its findings admitted that they had never seen him drink nor had they ever seen a bottle of liquor in his office and that the only indication that he gave as having had a drink was that he was sometimes lighthearted and facetious in conversation; furthermore, one of the two ladies was an aspirant for the principalship if Mr. Laney should be put out. It is a matter of common knowledge that some of our finest and most substantial and perfectly sober citizens are frequently light hearted and facetious in their conversation. To say the least of it, that is very poor evidence of even partial intoxication. We do not doubt that these good ladies thought that they were telling the truth, but their testimony is so thoroughly refuted by the other witnesses that we strongly suspect that Mr. Laney must have used a shaving lotion which contained

alcohol. It is also a matter of common knowledge that it is most unusual for a man in the prime of life, even though he be what might be called a drinking man, to do any drinking in the early morning. Our conclusion is that there is no substantial evidence to sustain the second and third charges.

The fourth charge was to the effect that during the month of February, 1937, H. J. Laney, at a drug store in Apopka, approached one Dorothy Damsell, a student at the school, and told her that she had lovely limbs, and then and there attempted by flattery to seduce the said girl.

The revised findings of the Board as to this charge was to the effect that while they believed the testimony of the witness, Dorothy Damsell, as to this charge, yet, in view of the opinion of the Supreme Court on the previous appeal it appeared that the Board was without authority to take any action as to conduct on the part of the teacher that occurred before the enactment of Chapter 18743, The Teacher Tenure Act.

As a matter of fact this fourth charge was not proven. It is true that the young lady did testify that back in January or February of 1937, she entered Sheppard's Drug Store in Apopka and Mr. Laney was sitting at one of the tables close to the counter where she was standing. That he had a brief conversation with her with reference to how she was getting along in school which she had entered on January 18, 1937, and told her that she should get along well; that she was a very attractive girl and had nice legs. She said that that surprised her but she did not say that it insulted her. She thanked him and walked out of the store. She remembered that the clerk was there but she does not recall that there were any customers present. Of course, this evidence doesn't show any attempt at seduction. Indeed, neither the facts charged, nor the testimony in support of it, show any attempt to seduce. Such a serious charge should not be lightly or recklessly made. Shakespeare spoke advisedly when he had one of his characters say "He who steals my purse, steals trash; but he who filches from me my good name, takes that which not enriches him, and leaves me poor indeed."

The fifth charge, which was set forth in the report of the case when it was here before (See 8 So. (2nd), page 467, 150 Fla. 627), is a very serious charge, another charge of attempted seduction, but the testimony of the young lady when on the stand in this case showed clearly that the matters and things complained of in that charge, according to her own testimony, took place before the Teacher Tenure Act was adopted, and this charge should have been stricken or withdrawn for the same reason which caused the Board of Public Instruction to make no finding whatever with reference to charge No. 4. Statutes are regarded as prospective in their operation unless the language of the statute requires it to be given a retroactive operation. As we understand this Act, it does not seek to penalize teachers for acts done before the statute went into effect, which in this case was May 24, 1937. In her testimony Miss Damsell said: "I left Florida on the 27th of May. I didn't see Mr. Laney for two weeks previous to that. The last time I saw him was approximately two weeks before I left." (Transcript, page 94). She left on May 27, 1937, to visit her former home in a distant state. So, the 5th charge as well as the 4th charge should have been stricken or withdrawn. We might say, however, in passing, that the testimony of the single witness on which the Board sustained this charge is highly improbable and is at variance with the physical facts with reference to the *locus in quo,* which facts were established by the testimony of numerous witnesses. Mr. Laney emphatically denied the charge. Miss Damsell admitted that she never mentioned the alleged misconduct, even to her father or mother, until a few months before the charges were filed in 1941, a period of nearly four years.

We come now to the 6th charge, which is also set out on the same page and in the same volume of the Southern Re-- porter above referred to. In brief it charges that Mr. Laney, on or about December 24, 1940, indulged in the use of intoxicating liquors and became drunk, and then and there attempted to seduce one Katherine Hogshead, etc.

The Board itself, in its revised findings, admitted that this charge of an attempted seduction was not proven. Why this

serious charge of an attempt to seduce the young lady was included, is not made to appear. Nor was there any proof whatever that Laney "became drunk." However, the sixth charge did embrace "the use of intoxicating liquors," on that date, and the Board found him guilty of that, and stated that such indulgence was under such circumstances as to impair his usefulness as a teacher in the public schools of Orange County; that as to this charge the Board believed the testimony of Katherine Hogshead, and that the testimony of the other witnesses was not sufficient to overcome this belief.

It appears from the testimony that Mr. Laney had agreed to help four of the young ladies in Apopka to obtain jobs with the National Youth Administration, which had an office in Orlando, which City is not very far from the town of Apopka. He knew the gentleman in charge of the office quite well. Late in the afternoon of December 24, 1940, he found that that was the last day on which the applicants could register. Although he had been hunting nearly all day, he tried to get in touch with all four of the young ladies over the telephone, three of them being students of his school, and offered to take them over to Orlando and render any assistance he could, but for one reason or another three out of the four either could not or would not go and Miss Hogshead was the only one of the four who wanted to go. By that time it was about seven in the evening and he called at Miss Hogshead's home to take her over to Orlando to register before the time was out. On the way over, Miss Hogshead testified that Mr. Laney stopped twice, once at the "Legion Home" on the highway, where he ordered and drank a bottle of grenay. The testimony is not very clear as to just what "grenay" is, but it appears to have been some kind of beer. Also she said that he stopped at some filing station in College Park, the name of which she did not know, and drank two bottles of ale. Witness also thought he had been drinking before he came for her. She testified on cross examination that he drove very slowly and carefully, at a reasonable rate of speed, and she did not notice him doing anything ridiculous or dangerous while driving. Mr. Laney denied her story with reference to the drinking of the grenay and the ale, and the testimony of

the man who ran the Legion Home supported Laney's testimony. The particular filling station in College Park was not identified; so no filling station operator was called to testify. Mr. Laney said that he did not stop anywhere on that trip. He further testified that as they were approaching Orlando, Miss Hogshead told him, in the course of their conversation, that she did not intend to do the work contemplated by the N.Y.A., even if she was given the job, and that he reproached her for taking that position and told her that it was not fair to the N.Y.A., and that he would not be a party to it. She resented his remarks and he turned around and drove back to Apopka and put Miss Hogshead out at her home, about 7:30 or 7:45, and that she exhibited her anger by getting out quickly and slamming the door as hard as she could. He said that on the return trip she hardly spoke to him. But taking Miss Hogshead's testimony at its face value, none of the allegations of the 6th charge were proven, and the charge in its entirety should either have been stricken or withdrawn by the Board or a finding of not guilty made on that charge.

Coming now to the 7th and last charge, it alleges that in November 1940, Laney saw Mallory Welch "and solicited the said Welch to approach the sheriff of Orange County and find out for me, the said Laney, whether or not the said sheriff would permit the said H. J. Laney to sell Bolita tickets at a drug store on West Church Street in Orlando in which the said H. J. Laney was interested, and they say that the sale of Bolita tickets is immoral and unlawful and that the conduct of said H. J. Laney in attempting to be permitted to violate the law on this subject was immoral."

It is extremely doubtful that this very vague and equivocal charge sets forth any statutory cause for the removal of Laney as principal or teacher. The nearest statutory charge that it can be said to fit is the general charge of "immorality" (subsection (a) of Section 4 of Chapter 18743.) We see no immorality in the request that Laney was alleged to have made of Mallory Welch, if in fact he ever made such request. It appears that at the time that this statement was alleged to have been made by Laney, the particular man evidently referred to as "sheriff," Mr Jim Black, was at most, merely

the sheriff-elect.  He had not entered upon the discharge of his duties.  It will be noted that Laney is not alleged to have asked Mallory Welch to ask the sheriff-elect to let him sell bolita tickets at said drug store, nor is it alleged that he told Welch that he intended to sell bolita tickets at such drug store if allowed to do so, nor is it charged that he ever did sell or permit the sale of any bolita tickets at said drug store.

The testimony in this case discloses that Mr. Laney had been requested to run for sheriff.  This request was made on behalf of a group of citizens who were opposed to the sale of bolita tickets in the county which had been going on for some time.  Laney declined to run, but a reputable citizen of Apopka asked him to find out whether Mr. Jim Black, who was then a candidate for sheriff would put a stop to the bolita racket.  Laney was a member of the anti-bolita faction.

Mallory Welch testified that he mentioned the matter to Mr. Black and that Mr. Black merely laughed.  Welch did not remember whether this took place after the primary election or after the general election.  The evidence shows that no bolita tickets were ever sold in the drug store in which Mr. Laney held an interest, after he acquired that interest, but Laney himself testified that he had been informed that bolita tickets had been sold at that drug store before he and his brother took over the business.

Mr. Black testified that he did remember a conversation with Mallory Welch while he, Black, was running for the office of Sheriff, before or after the primary, and that Welch mentioned the fact that Mr. Laney had been to him and asked him, Welch, to see the witness about operating bolita; that he did not remember the exact words; that it was how witness felt about bolita.  That was the substance of it.  As witness remembered it, it was after witness had been nominated.

Mr. Laney testified that he thoroughly agreed that the sale of bolita tickets was unlawful and immoral; that none had ever been sold in said drug store after he and his brother took it over, though people had come in occasionally and asked for bolita tickets.  The clerks were instructed to tell the people that they did not sell it and had never handled

it and after two months they stopped asking for bolita tickets. Mr. Laney stated that as a matter of fact he had talked to Mr. Mallory Welch about the bolita situation. This was during school and before Mr. Black had announced for sheriff; that Mr. Connor had requested him to run for sheriff to put a stop to the bolita business; that he Laney was positive that Mr. Black was coming out for sheriff; that he had known him a long time and that he believed if Mr. Black was elected he would be the logical man to bring a stop to the bolita racket in Orange County. That Mr. Connor told him if he, Laney, would not run for sheriff, to find out Jim Black's attitude on bolita, and that witness told Mr. Connor that he could ascertain from Mr. Welch, who was a friend of witness and also of Mr. Black. That witness would see Mr. Welch and tell him he would like to know what Jim Black was planning to do about the bolita racket when he went into office. Mr. Laney did not recall whether Mallory Welch said whether he would ask Jim Black or not, but that he never heard from him after that. Thereupon Laney himself asked Black what he was going to do about the bolita business and that Black told witness he did not know what he was going to do about it. Laney then went to Virgil Connor and told him what Black had said.

So there is no substantial evidence to prove this very equivocal 7th charge, which charge, even as made, was denied by appellant.

Numerous witnesses, a score or more, from both Orange and Seminole counties, testified to the good character of Mr. Laney. The evidence as a whole shows beyond any question that this appellant was a very able and efficient principal. There is no evidence in the record to the contrary. He had served for seven years as principal of the schools in Oviedo in Seminole County, and for eight years as principal of the public schools in Apopka. At the time of this trial Mr. Laney was thirty eight years of age, married and had one son. He was chairman of the Board of stewards of the Methodist Church in Apopka, a member of the Rotary Club, and active in civic affairs. One of the members of the Board of Stewards stated that Mr. Laney had made the best chairman they had

ever had. Private citizens and county and district school officials from Apopka and Oviedo, and from Orange and Seminole counties respectively, testified that he was a man of high character, a perfect gentleman and had made a competent and satisfactory principal; the best they had ever had, said a trustee from Oviedo. The County Superintendent of Orange County testified that Laney's work as principal of the public schools of Apopka had been entirely satisfactory and he had no criticism whatever to make of the quality of his work. There was also considerable testimony by men who knew Laney well that they had never known him to drink any kind of intoxicating beverage, or show any signs of having done so. Two of three trustees who filed these charges testified that they had no personal knowledge whatever of the truth of these charges, and one of them testified that he did not sign the charges until he was told by the regular retained Attorney for the Board of Public Instruction, who also represented the trustees in prosecuting these charges, that, on the affidavits he produced and showed him, witness could be "mandamused" and compelled to sign them. The trustees had unanimously nominated Laney for re-election as principal and the Board had unanimously elected him as principal for the ensuing school year, July 1, 1941 to June 30, 1942, just a few weeks before these charges, coming unexpectedly like "a bolt from the blue," were preferred against Laney.

The general rule is that administrative findings, in order to be upheld by the courts must be supported by substantial evidence. This means that there must be evidence which supports a substantial basis of fact from which the fact in issue can be reasonably inferred. It must do more than create a suspicion of the fact to be established, and must be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. See State ex rel. v. Whitman, 116 Fla. 196, 156 So. 705; State ex rel. Hathaway v. Williams, 149 Fla. 48, 5 So. (2nd) 269; Florida Motor Lines v. Railroad Commission, 101 Fla. 1018, 132 So. 851; Nelson v. Lindsey, 151 Fla. 596, 10 So. (2nd) 131; Great Southern Trucking Company v. Douglas, 147 Fla. 552, 3 So. (2nd) 526; National Labor Relations Board v. Columbia Enamel

Company, 59 S. Ct. 502, 36 U. S. 292, 83 L. Ed. 660. The evidence in this case, tested by this rule, was insufficient to prove any of the charges.

For the reasons above pointed out the judgment of the court below is reversed and the cause remanded with directions that the Circuit Court vacate its original order or judgment of affirmance and that a judgment be now entered reversing the action of the Board of Public Instruction.

It is so ordered.

BUFORD, C. J., THOMAS and SEBRING, JJ., concur.