108 So.2d 601 (1959)
FLORIDA RATE CONFERENCE, a non-profit corporation, the Traffic and Rate Bureau of St. Petersburg, Florida, The Tampa Chamber of Commerce, The Broward County Traffic Association, The Greater Miami Traffic Association, and The Jacksonville Traffic Bureau, Petitioners,
v.
FLORIDA RAILROAD AND PUBLIC UTILITIES COMMISSION, The Florida Intrastate Rate Bureau, Respondents.
Supreme Court of Florida.
January 9, 1959.
Rehearing Denied February 23, 1959.
*602 Ben F. Overton, Em. Davis, of Baynard, Baynard & McLeod, St. Petersburg, for petitioners.
Lewis W. Petteway, General. Counsel for Florida Railroad and Public Utilities Commission, Tallahassee, A. Pickens Coles, John M. Allison, Tampa, for Florida Intrastate Rate Bureau, for respondents.
HOBSON, Justice.
This case was brought before us on a writ of certiorari requesting that we review an order of the respondent Florida Railroad and Public Utilities Commission granting a rate increase of 8.72% to the applicant Florida Intrastate Rate Bureau on behalf of all common carrier motor freight lines participating in Motor Freight Tariff FR&PUC MF No. 7.
The Intrastate Rate Bureau, representing eleven common carrier motor freight lines, originally applied to the Commission on behalf of these common carriers for a rate increase of 10% in all Class and Commodity Rates and Charges. The petitioners appeared at the hearing on the Rate Bureau's application as protestants for and on behalf of the shipping public in their respective metropolitan areas. Information as to petitioners' position in this case is best gleaned from the following excerpts of Order 3910 of the Commission, granting the 8.72% increase:
"Some time prior to the initial hearing in these Dockets, a prehearing conference was held in the offices of the Commission at Tallahassee, Florida between the motor freight carriers participating herein and the Commission's Staff for the purpose of simplifying the *603 issue as much as possible, determining the nature and scope of the exhibits to be offered at the hearing by various parties, and developing a separation procedure to be used by the carriers in ascertaining the inter-intrastate relationship of their operations. A separation procedure was agreed upon, reduced to writing and was subsequently received in evidence herein as Exhibit No. 92. The basic factors for the separation procedure were to be the actual revenues, truck and tractor miles and tons of revenue freight carried. At the conference representatives of Central Truck Lines stated that they could make a separation between interstate and intrastate operations on the basis of actual revenues, truck and tractor miles and tons of revenue freight carried. Because of this representation, and because Central appeared to be the most representative carrier participating herein with both interstate and intrastate operations, Central Truck Lines was selected to make the separation study which would be accepted as representing the inter-intrastate relationship of the carriers as a group.
"During the hearings it developed that the basic factors used in making the separation study were not actual as required by Exhibit No. 92, aforesaid. On the contrary a very simple but completely unreliable method was employed to determine interstate revenues, truck and tractor miles and tons of revenue freight carried. Schedules which originated or terminated at points outside the State of Florida were considered as exclusively interstate. These interstate schedules all originate or terminate at the carrier's basic terminals in Florida. The factors developed from this simple method did not comprehend shipments interchanged at Jacksonville with R.C. Motor Lines and other carriers. Neither did such factors take into consideration the miles and tonnage involved in transporting purely interstate shipments between such Florida terminals and Florida points of origin or destination. Miles of tonnage of this character were considered as intrastate in nature. All schedules moving between points within the state were considered as exclusively intrastate even though they might be transporting interstate shipments.
"Applicant's witnesses readily admitted the foregoing discrepancies but attempted to minimize their effect by expressing the unsupported opinion that intrastate operations were favored by the method used because intrastate received credit for revenues that would have been credited to interstate operations under a complete and accurate analysis. This conclusion of the witnesses is a matter of opinion, is not predicated upon any reliable facts presented at the hearing, and is not shared by the Commission.
"Transportation companies seldom, if ever, make a satisfactory showing before the Commission for increases in their intrastate rates and charges. They appear always to be convinced that their revenue problems result from intrastate rate deficiencies but the proof of that situation inevitably leaves much to be desired. Carriers must find some reliable approach to the problem of demonstrating the results revenuewise of the intrastate portion of their operations. Once a sound and reliable approach is found it must be observed and followed completely in every detail.
"We are sounding the warning now to the common carrier motor freight lines that future cases of this kind must be supported by more reliable separation techniques. We believe the procedure outlined in Exhibit No. 92 aforesaid would have produced more satisfactory results had the separation procedure outlined therein been followed *604 as intended. It is the purpose of this Commission to require the common carrier motor freight lines participating in this case to begin a continuing and permanent separation study with monthly reports to the Commission so that we may be fully and accurately advised concerning the revenue results of intrastate operations. The procedures to be observed in this continuing study will be announced in sufficient time for the study to be commenced in July of this year.
"In the meantime, system-wide exhibits of the various carriers, and their annual and quarterly reports filed with the Commission, strongly indicate that some of the carriers are in need of rate relief. The operating ratio is the most frequently used measure of a motor carrier's revenue needs and financial condition. * * *"[1]
The Commission determined that the applicants as a group were in need of total additional revenue (intrastate and interstate) in the amount of $1,540,994. The Commission, in its order, then said:
"Apportioning these additional revenue requirements between interstate and intrastate services poses the most difficult part of the problem. The separation study already mentioned herein was intended to simplify this problem. While we feel that the study did not follow the stipulated procedure, and is therefore unreliable, we must make some use of it because we have no other source from which to draw in making the necessary apportionment of revenues and expenses." (Emphasis supplied.)
The Commission, in its order, then made the necessary computation to enable it to enter the following finding:
"Based upon the record herein, including the quarterly and annual reports filed with the Commission by the participating carriers, the Commission finds as follows:
"(1) The common carrier motor freight lines participating in Motor Freight Tariff FR&PUC MF No. 7 are in need of additional intrastate revenues in the total sum of $971,549 on the basis of 1956 operations adjusted for revenue and expense increases occurring during that year and comprehending 1957 wage increases actually committed and agreed to by contract.
"(2) The additional revenues needed by the carriers can be produced by increasing minimum charges twenty-five cents (25¢) per shipment, and by increasing Class and Commodity Rates and Charges by 8.72%
"(3) The rates and charges when increased as aforesaid will be fair, just, reasonable, and compensatory.
"(4) Overseas Transportation Company should be required to discontinue assessing the arbitrary described above for a test period of one year. At the end of the test period the effect of the discontinuance of the arbitrary on the carrier's operating ratio will be determined as the basis for further action concerning the reinstatement or elimination of said arbitrary.
"(5) The increased rates and charges herein authorized should become effective upon proper tariff publication by applicant."
*605 One of petitioners' contentions is that it was improper for the Commission to grant this rate increase to eleven carriers on the basis of evidence submitted by one carrier (Central Truck Lines, Inc.), particularly when this carrier is not representative of the other carriers involved.
This contention of the petitioners has been carefully considered and found to be without merit. The Legislature has authorized the Commission to determine facts in making and enforcing administrative rates, rules and regulations. Such determinations when duly made are, by statute, clothed with a presumption that they are prima facie reasonable and just. F.S.A. § 350.12(2) (m). On review this presumption of validity can only be overcome when either the invalidity of the Commission's decision appears plainly on the face of the order, rule, regulation or schedule, or where such weakness is made to appear by clear and satisfactory evidence.
Our examination of the record upon which the Commission based its order discloses that the Commission had before it evidence which included the annual and quarterly financial reports of all eleven carriers, as well as their current operating ratios. The Commission's determination that a rate increase was needed was based on competent substantial evidence supplied by the various carriers involved, including Central Truck Lines.
The record also shows that the selection of Central Truck Lines as the most representative carrier involved with both intra and interstate operations was not arbitrary or unreasonable. Even if we accept petitioners' assertions that Central Truck Line's operating expenses in certain areas are higher percentage-wise than those of the other carriers involved, we do not believe the petitioners have, by clear and satisfactory evidence, shown that Central Truck Lines was not sufficiently representative to provide the material it was selected to present. The petitioners have failed to overcome this statutory presumption in favor of the validity of the Commission's decision and, therefore, cannot prevail as to this point.
The major issue in this petition concerns the validity of the separation study prepared by Central Truck Lines, Inc. As indicated by the Commission's order, Central was selected to prepare a separation study designed to separate its revenues and expenses incident to intrastate operations from those connected with its interstate operations.
The petitioners assume the position that when a common carrier operates in both intrastate and interstate commerce, its revenue and expenses must be separated between intra and interstate by competent evidence before an intrastate rate increase can be granted by the Railroad and Public Utilities Commission. In support of this contention they cite that portion of the case of State ex rel. Railroad Com'rs v. Louisville and Nashville R. Co., 1912, 62 Fla. 315, 57 So. 175, 190, wherein this court said:
"Where the same property, labor, and management are used at the same time by a common carrier in interstate and intrastate commerce the value of the property and labor and management used should be properly apportioned in determining the reasonableness of the compensation for service rendered by the carrier in the intrastate business taken separately and as an entirety, or in connection with the interstate business concurrently done."
See also State ex rel. Railroad Com'rs v. Seaboard Air Line R. Co., 1904, 48 Fla. 129, 37 So. 314, 320.
The reason behind this rule was explained in the following section of American Jurisprudence, where it is said:
"A state cannot justify unreasonably low rates for domestic transportation, considered alone, upon the ground that the carrier is earning large profits on its interstate business, nor can the carrier impose unreasonably high rates on *606 domestic business in order to meet losses on interstate business; the reasonableness of the rates to be fixed by the state must be decided with reference exclusively to what is just and reasonable in respect of domestic business." 9 Am.Jur., p. 520, § 130.
We believe the Commission's statement on this subject in the disputed order is of compelling significance. The Commission, after determining the total amount of additional revenue that it would take in its judgment to give all the carriers involved a reasonable return on their investment, said:
"While we feel that the study did not follow the stipulated procedure, and is therefore unreliable, we must make some use of it because we have no other source from which to draw in making the necessary apportionment of revenues and expenses." (Emphasis supplied.)
This court recognizes that the Railroad Commission has the difficult and highly technical duty of regulating motor highway common carriers. Over the years it has gained a great deal of experience and knowledge in this field. In the instant case we are content that its characterization of the separation study as being "necessary" to its establishment of a reasonable rate, was a sound exercise of its decisional powers.
We have now reached the very fulcrum of this case. For we are asked to pass upon the validity of a Commission order which, by its own terms, has used an "unreliable" separation study to support a "necessary" apportionment of revenues and expenses because it "had no other source from which to draw this information".[2]
The scope and procedure of the review of administrative orders has been often set forth. From the cases it is clear that on certiorari this court will not undertake to re-weigh or re-evaluate the evidence presented to the administrative body whose order is under examination. This court is charged with the duty of examining the record to determine whether the agency's order is in accord with the essential requirements of law and whether the agency had before it competent substantial evidence to support its findings and conclusions. De Groot v. Sheffield, Fla. 1957, 95 So.2d 912, 916.
With reference to actions by the Railroad & Public Utilities Commission, the Legislature has clothed the orders with a presumption of validity. Section 350.12(2) (m), F.S.A., reads in part as follows:
"Every rule, regulation, schedule or order heretofore or hereafter made by the commissioners shall be deemed and held to be within their jurisdiction and their powers, and to be reasonable and just and such as ought to have been made in the premises and to have been properly made and arrived at in due form of procedure and such as can and ought to be executed, unless the contrary plainly appears on the face thereof or be made to appear by clear and satisfactory evidence, and shall not be set aside or held invalid unless the contrary so appears. All presumptions shall be in favor of every action of the commissioners and all doubts as to *607 their jurisdiction and powers shall be resolved in their favor, it being intended that the laws relative to the railroad commissioners shall be deemed remedial laws to be construed liberally to further the legislative intent to regulate and control public carriers in the public interest."
It is clear that the above statutory injunction imposes a duty upon petitioners to either satisfactorily and clearly show the errors upon which they rely, or to show that such error plainly appears on the face of the order.
If there is competent substantial evidence to sustain the findings and conclusions of the Commission, and no rule of law was violated in the proceedings, and the whole record does not disclose an abuse of authority or arbitrary action, the findings and conclusions of the Commission will not be set aside on certiorari, even though the reviewing court might have reached different conclusions on the evidence. Florida Motor Lines v. State Railroad Commission, 1931, 101 Fla. 1018, 132 So. 851, 862. It is equally clear that the reverse of this holds true, for we have held that where a rate, rule or regulation is made without statutory authority or without giving the carrier affected by it, reasonable opportunity to be heard, or without obtaining or considering any substantial evidence, where investigation, inquiry and evidence are necessary as a basis for the action taken, the proceeding is not had in due course of law and this court will not enforce it. State ex rel. Railroad Com'rs v. Florida East Coast R. Co., 1912, 64 Fla. 112, 59 So. 385, 393.
In the instant case we are blessed with the unique opportunity to inspect the precise evidence which led the Commission to it findings and conclusions, for the Commission has in its order discussed in detail the logical processes and data used in arriving at its findings. The Commission's error, if any, thus plainly shows upon the face of its order. By its own statements the Commission has found the disputed separation study "necessary" to its conclusions. Further, the Commission has measured the separation study against its experience in this field and determined the study was "unreliable". And last, but not least, the Commission has stated it must make some use of this "unreliable" study "because [it had] no other source from which to draw" in making the apportionment between intra and interstate expenses and revenue. The question is clearly whether or not the Railroad Commission may ground an essential portion of its order solely on evidence it characterizes as unreliable. We think not. Although we are fully aware of the statutory presumption in favor of such orders and know our obligation to resolve all doubt in favor of the validity of the Commission's actions, it is our opinion that Order 3910 clearly shows upon its face that it is not supported by competent substantial evidence.
Although the terms "substantial evidence" or "competent substantial evidence" have been variously defined, past judicial interpretation indicates that an order which bases an essential finding or conclusion solely on unreliable evidence should be held insufficient.
In the case of N.L.R.B. v. A.S. Abell Co., 4 Cir., 1938, 97 F.2d 951, 958, a federal court said that the substantial evidence rule is not satisfied by evidence which merely creates a suspicion or which gives equal support to inconsistent inferences. And in Milford Copper Co. of Utah v. Industrial Commission, 1922, 61 Utah 37, 210 P. 993, 994, the court said that evidence to be substantial must possess something of substantial and relevant consequence and must not consist of vague, uncertain, or irrelevant matter not carrying the quality of proof or having fitness to induce conviction. Surmise, conjecture or speculation have been held not to be substantial evidence. White v. Valley Land Company, 1958, 64 N.M. 9, 322 P.2d 707, 709.
And in this state in the recent case of De Groot v. Sheffield, supra, Mr. Justice Thornal *608 capably defined the term and its usage when he wrote
"We have used the term `competent substantial evidence' advisedly. Substantial evidence has been described as such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred. We have stated it to be such relevant evidence as a reasonable mind would accept as adequate to support a conclusion. Becker v. Merrill, 155 Fla. 379, 20 So.2d 912; Laney v. Board of Public Instruction, 153 Fla. 728, 15 So.2d 748. In employing the adjective `competent' to modify the word `substantial,' we are aware of the familiar rule that in administrative proceedings the formalities in the introduction of testimony common to the courts of justice are not strictly employed. Jenkins v. Curry, 154 Fla. 617, 18 So.2d 521. We are of the view, however, that the evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached. To this extent the `substantial' evidence should also be `competent.' Schwartz, American Administrative Law, p. 88; The Substantial Evidence Rule by Malcolm Parsons, Fla.Law Review, Vol. IV, No. 4, p. 481; United States Casualty Company v. Maryland Casualty Company, Fla. 1951, 55 So.2d 741; Consolidated Edison Co. of New York v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126."
The evidence relied upon to sustain the ultimate finding in this case has been characterized by the Railroad and Public Utilities Commission as "unreliable". Webster's New International Dictionary (2nd Edition) defines unreliable to mean not reliable; undependable; untrustworthy.
Our administrative evidentiary standard is competent substantial evidence. It is clear that the use of unreliable evidence as the sole foundation of an essential portion of the Commission's findings fails to meet this standard. This order is not grounded upon competent substantial evidence legally sufficient to support the Commission's findings and conclusions. This fatal deficiency is etched boldly upon the face of the order herein challenged.
For this reason the petition for writ of certiorari is granted and Order 3910 of the Florida Railroad and Public Utilities Commission is quashed.
TERRELL, C.J., and THOMAS and O'CONNELL, JJ., concur.
ROBERTS, J., dissents.
NOTES
[1] The operating ratio is the proportion which operating expense bears to operating income. Stated another way, the operating ratio represents the number of cents required to be expended as operating expenses in producing one revenue dollar. An operating ratio in excess of 100 would indicate that operating expenses exceeded operating revenues. Just how low the operating ratio should be is one of the problems of motor carrier rate making. (Taken from Railroad & Public Utilities Commission's Order No. 3910, June 5, 1957.
[2] The record discloses that a five day actual traffic study of all 11 carriers was conducted. This exhibit was designed to show how the present revenue was split between intra and interstate commerce and what effect on future revenue the proposed increases would have. This exhibit does not contain a separation of interstate and intrastate costs and expenses. The results of such short period studies was stated to be unreliable by a member of the Commission staff. We mention this study here merely to show that were it not for the Commission's own statements, in the order, informing us of the evidence upon which it based its findings and conclusions, we would be presented with the more difficult problem of determining whether or not the other evidence of record was sufficient to support the Commission's findings and conclusions.