318 So.2d 458 (1975)
GULFSTREAM PARK RACING ASSOCIATION, INC., a Florida Corporation, Petitioner,
v.
BOARD OF BUSINESS REGULATION OF the DEPARTMENT OF BUSINESS REGULATION, a State Agency, and Hialeah Park, Inc., a Florida Corporation, Respondents.
No. Y-549.
District Court of Appeal of Florida, First District.
August 29, 1975.
*459 J. Elliott Messer, and M. Stephen Turner, Thompson, Wadsworth & Messer, Tallahassee, and Leonard Romanik, Landefeld & Romanik, Hollywood, for petitioner.
William Moore and Marion E. Sibley, Sibley, Giblin, Levenson & Ward, Miami Beach, for respondents.
SMITH, Judge.
Petitioner Gulfstream Park Racing Association, Inc., seeks review of an order of the Board of Business Regulation awarding Hialeah Park, Inc., the prime midwinter thoroughbred horse racing dates for the 1975-76 Florida winter season. The issue is whether the order is supported by law and by competent substantial evidence.
The Hialeah/Gulfstream run for the coveted middle forty days has become an annual judicial event. Until 1972, the middle dates were Hialeah's exclusively because §§ 1-6, Ch. 23728, Fla.Laws 1947, § 550.081, F.S. 1949-1971, rewarded the track producing the greatest pari-mutuel tax revenue each year with its choice among the three racing periods of the next season. Each year that track was Hialeah, principally because it raced the profitable middle dates in the first year, consequently remitted the greatest tax revenue to the State, chose to do the same in the next year and repeated the process annually for more than 20 years. Section 550.081 was held not unconstitutional per se against Gulfstream's equal protection challenge in 1948. Hialeah Race Course, Inc. v. Gulfstream Park Racing Ass'n, Inc., 37 So.2d 692 (Fla. 1948) (which we will refer to as "Hialeah 1948"). But in 1971 Gulfstream's aggressive development of comparable track facilities and strong performance in less attractive racing dates led the Supreme Court to invalidate the preferential aspects of § 550.081 as denying Gulfstream equal protection of the law. The Court directed the Board to assign dates "in the next and succeeding racing years in the manner provided by law, unaffected by voided Section 550.081, Florida Statutes... ." Hialeah Race Course, Inc. v. Gulfstream Park Racing Ass'n, Inc., 245 So.2d 625, 629-630 (Fla. 1971) ("Hialeah 1971"). And so began the annual struggle for season position which continues today.
When the Board exercised its new-found discretion by granting Hialeah the middle dates for the 1971-72 season, notwithstanding the invalidation of Hialeah's statutory preference, the Supreme Court on certiorari vacated that decision and awarded the middle dates to Gulfstream. Gulfstream Park Racing Ass'n, Inc. v. Div. of Pari-Mutuel Wagering, 253 So.2d 429 (Fla. 1971) ("Gulfstream 1971"). A year later, when the Board attempted to give Gulfstream a second opportunity in the middle dates to develop ability to perform handsomely for itself and the State, the District Court of Appeal sustained the Board [Hialeah Race Course, Inc. v. Board of Business Reg., 267 So.2d 839 (Fla.App.3rd, 1972)] but the Supreme Court reversed and ordered Hialeah restored to the middle dates. Hialeah Race Course, Inc. v. Board of Business Reg., 270 So.2d 366 (Fla. 1972) ("Hialeah 1972"). The Board alternated the middle dates back to Gulfstream for the 1973-74 season, and Hialeah's petition for certiorari to the Supreme Court was denied without opinion. State ex rel. Hialeah Park, Inc. v. Board of Business Reg., 287 So.2d 679 (Fla. 1973). Last year, when the Board reassigned the middle dates to Hialeah for 1974-75, Gulfstream acquiesced without litigation.
Full exploitation by the State of the revenue-generating capacities of thoroughbred racing requires that Florida's three principal winter tracks, Hialeah, Gulfstream and Tropical Park (which runs at Calder in the early season beginning in November) not operate simultaneously. Sec. 550.081(1), *460 F.S. 1973.[1] So the Board's award of the profitable middle dates to Hialeah for 1975-76 relegates Gulfstream for the second consecutive year to the less attractive "spring dates" of March and April, when most of Florida's winter visitors have departed and when warmer days and richer purses at northern tracks beckon the finer horses and jockeys.
The Board has awarded the middle dates to Hialeah, notwithstanding that it thereby interrupts an established rotation pattern and gives the poorer revenue producer the choice dates desired by the better producer, on two alternative grounds. They are: (1) the State's overall financial interest in the 1975-76 season will thereby be better served and (2) Hialeah's recurring losses are strong and compelling reasons why it should have the more profitable dates (see Hialeah 1972, 270 So.2d at 371).

I.
The State's only interest in permitting and encouraging betting on horses is the raising of tax revenue. That policy is dictated by the provisions in § 550.081, F.S. 1973, and by repeated emphasis in Supreme Court decisions. Hialeah 1948, 37 So.2d at 694; Hialeah 1971, 245 So.2d at 629 and dissenting opinion at 630; Gulfstream 1971, 253 So.2d at 431, quoting Hialeah 1971; Hialeah 1972, 270 So.2d at 371. The same policy is underscored in the 1975 legislative remodeling of § 550.081 and related statutes. Chapter 75-43, Fla.Laws 1975.
The objective of maximizing tax revenue has been thought to be best served  in the absence of some overriding consideration  by awarding the favored midwinter dates to the track which produces better tax revenues. That was the effect of § 550.081, F.S. 1971, and the Supreme Court's decision invalidating that statute accepted sub silentio the legislative preference for the best producer while insisting that Gulfstream be given an equal opportunity to qualify. Hialeah 1971, 245 So.2d 625; see also Gulfstream 1971, 253 So.2d at 431. In 1972, however, the Supreme Court's adherence to the best producer rule, "all other factors being equal," became more explicit. Overturning a Board decision which on grounds of equality of opportunity awarded Gulfstream a second consecutive year in the midwinter dates, the Court stated:
"It is significant, but not always controlling, that the revenue produced for the State by Gulfstream during the last season was $400,000.00 less than the revenue produced by Hialeah the prior season during the same racing period... .
"This Court will always strive to afford equal opportunity to all. We have in this case. But, all other factors being equal, tracks with records as best producers of revenue should prevail unless strong, compelling reasons otherwise dictate." (270 So.2d at 371).
The day is apparently gone when the Board might have simply compared current revenues from applicant tracks, comfortable in the realization that total pari-mutuel revenues were stable or increasing and that greater profits to the best producer were the only stakes. Compare the halcyon circumstances in which the Racing Commission assigned pari-mutuel dog racing dates *461 in 1954. State ex. rel. West Flagler Kennel Club, Inc. v. Florida State Racing Comm'n, 74 So.2d 691 (Fla. 1954). Thoroughbred racing in Florida has been in a decline for several years. Since peaking in 1969, pari-mutuel wagering handled by Hialeah and Gulfstream has declined from nearly $144 million to $116.5 million, and State revenues from their racing have declined from $12.5 million to $10.0 million.
In the order now before us, awarding Hialeah the 1975-76 midwinter dates, the Board forthrightly acknowledged that, in this period of declining revenues, Gulfstream consistently receives the greater handle, or gross pari-mutuel intake, and is consequently the better producer of State tax revenue. The comparative record of performance by the two tracks in recent years leaves no doubt that that is so:

Summary of handle and tax revenue (in millions of dollars). M indicates
 the track raced midwinter or middle dates, S indicates
 spring or ending dates.
 Gulfstream Hialeah Combined Gulfstream Hialeah
 handle handle handle tax rev. tax rev. 
1970-71 54.95 (S) 76.31 (M) 131.26 4.77 (S) 6.66 (M)
1971-72 72.34 (M) 51.79 (S) 124.13 6.26 (M) 4.44 (S)
1972-73 53.31 (S) 69.70 (M) 123.01 4.65 (S) 6.00 (M)
1973-74 70.73 (M) 46.32 (S) 117.05 6.08 (M) 4.00 (S)
1974-75 49.80 (S) 66.77 (M) 116.57 4.33 (S) 5.77 (M)

It can readily be seen that, despite gasoline scarcity and other detriments to a successful season, the tax revenue remitted by Gulfstream during midwinter 1973-74 exceeded Hialeah's revenue production in the midwinter dates of the banner tourist years immediately before and after. In the spring dates, too, Gulfstream's tax revenue in 1972-73 resisted a declining trend and exceeded Hialeah's tax revenue in 1971-72. Gulfstream did it again in 1974-75.
Notwithstanding Gulfstream's more impressive recent record and its claim to the midwinter dates as best producer, the Board has concluded that the State's interests will be better served by assigning Gulfstream the spring dates, in which its revenue-generating predominance over Hialeah is said to be greater than in the midwinter performances. Thus, the Board stated in the order before us,
"It therefore appears, and the Board so finds, that Gulfstream produces more revenue in either the winter or the spring dates, but that when Gulfstream runs the spring dates, the overall season revenues to the State, (combination of winter and spring) are higher. Hialeah does not produce as much revenue in the later spring dates as does Gulfstream. Evidence was received that Hialeah was built as a winter track, for use in cooler weather. Gulfstream is closer to the cooling coast breezes in both winter and spring dates.
"From the foregoing, the Board finds that the best interest of the State is best served, more revenue for the entire season is produced, by the award of the winter dates to Hialeah."
We believe that the Board was competent to decide that, in times of comparative distress in the pari-mutuel industry, it is entirely too simplistic to squander the more profitable midwinter dates on the stronger producer, regardless of the effect that action has on total State revenues for the entire season. If greater revenue to *462 the State is the goal, and it is, the Board may properly place the better producer of income where its better production is more pronounced, and it may do so despite the producer's outcry. Gulfstream had a constitutional right to an even-handed application of a statute prescribing the award of preferred dates, Hialeah 1971, 245 So.2d 625, but it has no constitutional right to the preferred dates. Hialeah 1948, 37 So.2d at 694.
In approving the Board's assertion of competence to reassess the State's interest in the light of changing circumstances, we do not presume to change law written by the Supreme Court. As we have seen, the Supreme Court's stated preference for the best producer (Hialeah 1972, 270 So.2d at 371) mirrored a policy embodied in § 550.081, F.S. 1971, which by common consent survived the statute's invalidation. But the best producer has been preferred, not for its own sake, but for the State's.
Constitutional limitations aside, the Supreme Court has consistently emphasized that advancement of the State's interest is paramount and that, where that course is clear, other considerations are secondary. In Hialeah 1971, 245 So.2d 625, and Gulfstream 1971, 253 So.2d 429, the Court was of course primarily concerned with the rectification of past deprivations of equal protection. But even then, the Court showed interest in whether "competition [between Gulfstream and Hialeah] is advantageous to the state." Gulfstream 1971, 253 So.2d at 433. And in Hialeah 1972, 270 So.2d 366, the Court expressed concern over the effect of schedule uncertainty on the financial stability of the tracks, but only because of the potential detrimental influence upon "the financial stability of the State and the counties." 270 So.2d at 371. When the Court in that case stated,
"... all other factors being equal, tracks with records as best producers of revenue should prevail unless strong, compelling reasons otherwise dictate." (270 So.2d at 371),
the Court clearly meant that the specified test should be employed as long as the State's paramount interests were thereby served. But "all other factors" are not equal when the State's paramount financial interests in this sensitive industry require its licensees, good and poor, to subordinate their own financial goals. See Hialeah 1948, 37 So.2d 692.
Shortly after the Board entered its order in this case, the 1975 Legislature endorsed the Board's refinement of the criteria for awarding racing dates by enacting Chapter 75-43, Fla.Laws 1975, amending § 550.081(1)(c), F.S., for a limited period of two years to read in part:
"In allocating the racing dates ... the Board ... shall take into account the ability of all winter permit holders to maximize handle throughout the entire 144[2] day racing period so as to generate overall the maximum state revenue from winter permit holders collectively."
As long as the Board is satisfied, as it has stated it is, that the contending track owners are equal in skill and diligence of management, the Board may properly equate the State's interest with the greatest amount of aggregate season revenue even though application of the test may place the superior producer in the difficult, less rewarding dates, and reward the poorer producer with more profitable dates. In adopting such a standard, however, the Board increases its duty to be vigilant against the danger that a track whose less fruitful efforts have been so rewarded *463 will, for that reason, become less fruitful still. If and when that occurs, the State's interests will be imperiled and the Board's new policy will be not merely ineffectual but detrimental.
While we approve the Board's fashioning of a refined test for ascertaining the public interest, we cannot approve the Board's application of its test to the evidence here before it. There is no competent substantial evidence to support the Board's finding that the State's combined revenues from the midwinter and spring racing dates have been or will be higher when Gulfstream runs the spring dates and Hialeah the midwinter dates. In the last four racing seasons, each of the contenders has run twice in midwinter and twice in the spring dates. In the two years when Gulfstream ran at midwinter and Hialeah in the spring, the average combined handle was $120.6 million. When the roles were reversed, the average combined handle was not substantially more, as the Board found, but barely less: $119.8 million. The Board reaches its stated result only by including the 1970-71 combined handle in the average. Thereby the Board shows an average of $123.6 million aggregate handle when Gulfstream raced the spring dates, indicating, as the Board found, that "when Gulfstream runs the spring dates, the overall season revenues to the State ... are higher."[3] But inclusion of the combined 1970-71 handle is faulty for three reasons:
First, it is inappropriate to give weight to Hialeah's performance at a time when the track was owned and operated by the predecessors to the present owners, who purchased it in 1972.
Second, inclusion of the 1970-71 figures reverses the comparison results not because of a superior performance by Gulfstream in the spring of 1971  which is, after all, the Board's hypothesis  but because of a remarkably good performance by Hialeah in the midwinter dates.
Third, it is unrealistic to assign the 1975-76 racing dates on the basis of averages which are so dramatically influenced by Hialeah's handle of $76.3 million in 1971  a record of performance which has not been equaled by either track since then and from which Hialeah sank by $6.6 million in 1973 and by another $2.9 million in 1975.
If the 1970-71 season figures are pertinent at all, they tend to show only that Hialeah has since done poorly in the midwinter dates, not that Gulfstream is more obviously superior to Hialeah in the spring dates than in the midwinter dates.
It therefore appears that the Board's assignment of Hialeah to midwinter dates and Gulfstream to spring dates in 1975-76 cannot be sustained by competent substantial evidence that, on the basis of valid comparisons of past records, the State will likely receive more combined tax revenue.

II.
At its hearing on May 6 and 7, 1975, the Board gave little if any attention to its alternative finding, treated above, that "when Gulfstream runs the spring dates, the overall season revenues to the State ... are higher." That alternative ground appeared prominently for the first time in the Board's May 21 order, when perhaps it was apparent that the Legislature would act favorably, as indeed it did before the end of May, on the bill endorsing that consideration. Ch. 75-43, § 7, Fla.Laws 1975, amending § 550.081, effective May 30, 1975. At the hearing, the dominant concern *464 of a majority of the Board in allocating midwinter and spring dates for the 1975-76 season was saving Hialeah and the State from Hialeah's apparent financial ruination.
The Board did not determine this matter without considering, as was its duty (Hialeah 1972, 270 So.2d at 369-71), the factors of Hialeah's and Gulfstream's respective "interests" and the "good will, the quality of [horses], track facilities, geography [and] skill in management."[4]State ex rel. West Flagler Kennel Club, Inc. v. Florida State Racing Comm'n, 74 So.2d 691, at 692; Hialeah 1972, 270 So.2d at 369. While the Board's order implies that Hialeah has a greater interest in reducing its losses than Gulfstream has in maintaining its profits, the Board otherwise found that the contenders, judged in the light of the above-quoted factors, are equal. That being so, the Board invoked the stated exception to the Supreme Court's principal holding in Hialeah 1972:
"... all other factors being equal, tracks with records as best producers of revenue should prevail unless strong, compelling reasons otherwise dictate." (270 So.2d at 371, emphasis added.)
The same exception was mentioned in Justice Ervin's opinion for the Court in Gulfstream 1971, 253 So.2d 429, envisioning that the State's interests might best be served and the interests of two contending tracks might best be accommodated by
"a rotation system of racing dates annually between Gulfstream and Hialeah unless strong and compelling reasons otherwise dictate." (253 So.2d at 431, emphasis added.)[5]
On general application of the rules stated in Gulfstream 1971, 253 So.2d 429, and Hialeah 1972, 270 So.2d 366, Gulfstream would of course receive the 1975-76 middle dates. But the Board found "strong and compelling" reasons to rule otherwise:
"A review of the financial statements of Hialeah indicate that in 1972 Hialeah's net loss was $316,000; in 1973 its net loss was $430,000; in 1974 its net loss was $3,201,000; and in 1975 Hialeah's net loss was approximately $1,400,000... .
"In addition, Hialeah announced in the fall of 1974 that it intended to sell its permit and close its operation as a result of its financial losses. This sale was not consummated for various reasons, but the testimony has shown that the Hialeah Board of Directors and a majority of the shareholders did vote to sell its permit and close the racing facility at Hialeah. The chairman of its Board Mr. Galbreath, testified before the Board, that if Hialeah were awarded the mid-winter dates for the year 1975-76, it would operate irrespective of loss; and *465 the record currently indicates that its loss is much less when it runs the mid-winter dates than the spring dates.
"The Board finds that it would not be in the best interest of the State if Hialeah Race Track closed its operation because that closing would adversely affect the entire thoroughbred industry within the State of Florida, and could have a deleterious effect on other revenue producing industries, not the least of which is Florida's tourist industry. Owners of horses are annually attracted to Florida's winter racing season because of the continuing operation of the three race tracks (Tropical racing at Calder, Hialeah and Gulfstream), and the Board finds in addition, that Hialeah stabled and raced an impressive list of the nation's leading thoroughbreds. Even if the Board were to find (which it does not) that the individual test of production of revenue during a single period should prevail, there are, therefore, strong and compelling reasons to the contrary justifying, in the opinion of the Board, the awarding of the mid-winter dates to Hialeah.
"Further, this Board is thoroughly familiar with proposed financial relief for the thoroughbred industry, recommended by this Board to the Legislature, as well as with development of a uniform financial reporting system which will permit the State to better evaluate the condition of our pari-mutuel industry. This should keep each pari-mutuel permittee and horse owner in a relatively sound financial position (at least on a cash flow basis) during the evaluation period or until a long range plan is developed and enacted, which will hopefully inure to the benefit of the State and to the pari-mutuel industry. This adds to the Board's position on strong and compelling reasons contrary to any award to Gulfstream."
Gulfstream complains that the Board's assessment of Hialeah's financial condition is exaggerated and that the Board's intimation of Hialeah's imminent closing is only that, an intimation unsupported by competent substantial evidence. While we observe that Hialeah's losses recited in the Board's order are heavily (but not entirely) influenced by low capitalization and generous depreciation factors which do nothing to recommend Hialeah for special consideration at the hands of the State, we decline to substitute our judgment for that of the businessmen on the Board in the arcane science of evaluating Hialeah's financial statements. Sec. 120.68(10), F.S. 1973 (1974 Sup.); Department of Agr. and Consum. Serv. v. Strickland, 262 So.2d 893 (Fla.App. 1st, 1972). We therefore accept the Board's finding that the financial condition of Hialeah Park, Inc. is such that its continued operation is doubtful.
It is true also, as Gulfstream argues, that references in the testimony to an attempt by Hialeah Park, Inc. to sell its permit and close the racecourse are oblique and obscure. But substantial evidence of those events is not wholly lacking, and strict proof of circumstances corroborating the evidence of Hialeah's distress is not required. Sec. 120.58(1)(a), F.S. 1973 (1974 Sup.). We may therefore accept the Board's finding that Hialeah's financial straits are such that a serious effort has been made by the present owners to dispose of the track. Florida Rate Conf. v. Florida R.R. and Pub. Util. Comm'n, 108 So.2d 601 (Fla. 1959).
Hialeah's waning fortunes exemplify in a particularly aggravated way the state of affairs which the 1975 Legislature found requires emergency legislation:
"(1) It is the finding of the legislature that in general the attendance and wagers handled at the state thoroughbred horse racetracks have significantly *466 declined in recent years and that such a continuation will seriously jeopardize state revenues, as well as the future operation of these tracks.
......
"(4) It is further the finding of the legislature that thoroughbred horse racing facilities have certain fixed operational costs which are substantial and which remain relatively uniform and consistent throughout a racing meeting and that such fixed operational costs have reached a point where the continued operation of the thoroughbred horse tracks in Florida is in jeopardy." [Ch. 75-43, § 1(1), (4), Fla.Laws 1975].
The question, then, is whether the law given by Supreme Court decisions permits the Board in its discretion to assign the poorer producer the favored midwinter dates in a second consecutive year upon the ground that, without such relief, the poorer producer will likely fail. We have no doubt of it.
There is adequate evidence in the record to support the Board's finding that the success of Florida's winter thoroughbred season, like the stability of a three-legged stool, depends on contributions from both Hialeah and Gulfstream as well as from Tropical. Should Hialeah close, Florida would lose not only a grand tradition but also an historically important contributor to the thoroughbred industry in the state. The Board found, on ample evidence,
"... that the presence of the three tracks contribute[s] mutually to each other... . [I]f Hialeah were to close, the quality of horses would be adversely affected, even for Gulfstream."
The evidence further justifies the Board's apprehension that Hialeah's closing would adversely affect the breeding industry and tourism generally.
The sensitive task of allocating racing dates is nondelegably assigned to the Board of Business Regulation by statute. Sec. 550.011, F.S. 1973. The Board, in the exercise of its legal authority, perceives State interest in the preservation of Hialeah and, at least for now, of Hialeah Park, Inc. Having made that legitimate choice, the Board has taken circumspect action, for one season only, to prevent what on adequate evidence it considers would be a shocking economic blow to a major Florida industry affected with a public interest.
Unless this Court's function is to make racing policy rather than to read law, we must respect the Board's decision. The best producer has on occasion been judicially preferred, but Hialeah 1972, 270 So.2d 366, does not require such preference at the expense of the State and the ruin of another licensee. Justice Ervin's predicted rotation of the favored dates (Gulfstream 1971, 253 So.2d at 431) has become fact, and the Board may well consider that alternation between Hialeah and Gulfstream should be the norm when, as now, maximum season revenues are clearly the Board's objective. But fair as that system may be, it too must give way when overriding State interests require, just as a profitable arrangement with Hialeah gave way to constitutional considerations after Hialeah 1971, 245 So.2d 625.
The Board did not find that Hialeah's operation in the midwinter dates in the 1975-76 season would restore Hialeah to financial health, but we do not believe such a prediction by the Board is essential. In Gulfstream 1971, 253 So.2d 429, the Supreme Court held that the Board ought to have assigned the midwinter dates to Gulfstream because "equality of opportunity" was thought to be "a most important factor preponderating over nearly all other considerations." 253 So.2d at 431. The Court did not then predict, or require the Board to predict, that Gulfstream would be as *467 fruitful in 1971-72 as Hialeah had been in 1970-71. And in fact, Gulfstream did not equal Hialeah's prior record of revenue production in the middle dates. Hialeah 1972, 270 So.2d at 371. But the risk that Gulfstream might fail in its endeavor to match Hialeah, as prospectively viewed in Gulfstream 1971, 253 So.2d 429, did not make "equality of opportunity" any less an overriding consideration at that time. Similarly, the substantial possibility that the 1975-76 midwinter dates will not cure Hialeah's financial woes, and that Hialeah may yet fail, does not forbid the Board's allowing Hialeah that relief.
The record shows, as we have seen, that the State has received slightly less revenue on the average when Hialeah rather than Gulfstream operates in the midwinter dates. That slight disadvantage to the State is of little consequence in a single year. But the dangers of continuing to so reward the poor producer and to so penalize the better producer and the State are obvious. The Board may reasonably anticipate that, in the assignment of the 1976-77 midwinter dates, its position will be comparable to that of the Board in 1972-73, when the Board attempted to extend for another year the prior year's overriding policy of "equality of opportunity." That was held to be error. Hialeah 1972, 270 So.2d 366.
The Board's order awarding the 1975-76 thoroughbred racing dates is in accord with law and competent substantial evidence. We will therefore not disturb it. Because of the exigencies of time, the period for the filing of any petition for rehearing is shortened to five days. Gulfstream's petition is
Denied.
RAWLS, Acting C.J., and McCORD, J., concur.
NOTES
[1] It has been tacitly assumed by all concerned that no part of § 550.081 except the preferential allocation of racing periods was affected by the Supreme Court's 1971 decision. The concept of dividing the winter season into three exclusive racing periods for Hialeah, Gulfstream and Tropical Park (Calder) still prevails under the legislative finding "that two or more horse race tracks located within a radius of one hundred air miles of each other cannot operate on the same racing days without endangering the tax revenue derived therefrom and the general welfare of the public." Sec. 550.081(1), F.S. 1973. That policy, though unstated, continues in the 1975 amendment to § 550.081. Ch. 75-43, § 7, Fla.Laws 1975.
[2] The 1975 Act extends the racing season from 120 to 144 days, adjusts the beginning dates (Tropical's) and spring dates from 40 to 50 days and increases the middle dates from 40 to 44 days. This adjustment will tend to reduce the disparity of revenue and profitability between racing periods, as will greater disbursements from a common purse pool to the licensees operating in the beginning and spring dates. Chapter 75-43, § 2, Fla.Laws 1975.
[3] We compare average handle figures because that is what the Board did. The more pertinent tax revenue figures are in the same proportions: the average combined revenue in the two years when Gulfstream ran in mid-winter was $10.39 million; it was $10.38 million when Hialeah did so; and the result of averaging in 1970-71 revenues, when Hialeah ran at midwinter, is a figure of $10.73 million.
[4] It is surely difficult to measure, as a means of comparison, "the interest of the track owner[s]." Each has interests which will best be served by enjoying the midwinter dates. The quoted factors were perhaps more useful when, before 1947, § 550.02(1), F.S. 1941, required the Racing Commission to allocate dates among competing pari-mutuel operators in a "fair and impartial manner." That standard, eliminated by Ch. 24348, Fla. Laws 1947, emphasized fair dealing as between licensees as the primary consideration. See State ex rel. West Flagler Kennel Club, Inc. v. Florida State Racing Comm'n, supra. In later years the State's financial interest has been seen as paramount. See, e.g., Hialeah 1972, 270 So.2d 366.
[5] We do not read the Supreme Court's subsequent criticism of "the changing, altering and varying of the racing periods from year to year" (Hialeah 1972, 270 So.2d at 369) as criticizing a stable policy of rotating the mid-winter dates absent other strong and compelling reasons. Rather, the evil to which the Court there pointed was the uncertainty generated by constantly changing the criteria governing assignments. In Hialeah 1972, the Court itself rotated the favored dates back to Hialeah and set the pattern for the next two years.