433 So.2d 1329 (1983)
TROPICAL PARK, INC., a Florida Corporation, Petitioner,
v.
DEPARTMENT OF BUSINESS REGULATION, DIVISION OF PARI-MUTUEL WAGERING, Florida Pari-Mutuel Commission, and Steve Abramson, Leon Van Wert, James Lewis, Billy Vessels, and Theodore J. Couch, Respondents.
No. 83-972.
District Court of Appeal of Florida, Third District.
July 5, 1983.
*1330 Taylor, Brion, Buker & Green and James C. Pilkey, Miami, for petitioner.
David M. Maloney, Tallahassee, for respondents.
Before SCHWARTZ, C.J., and BASKIN and FERGUSON, JJ.
BASKIN, Judge.
By petition for a writ of mandamus, Tropical Park, Inc. seeks an order directing respondents, the Department, the Commission and the Division, to issue a license authorizing it to conduct fifty (50) days of thoroughbred racing for the first period of the winter racing season beginning November 11, 1983 and ending January 7, 1984.[1] Tropical Park asserts that it is entitled to an automatic award of its license pursuant to sections 550.011 and 120.60(2), Fla. Stat. (1981). Because we find that Tropical Park should be granted the requested relief under section 550.011(2), we need not address the applicability of section 120.60(2) to this petition.
Tropical Park is a permitholder authorized by the State of Florida to conduct winter thoroughbred racing. On January 3, 1983, Tropical Park filed its annual application for a license to operate during the winter racing season between November 11, 1983 and January 7, 1984. No other thoroughbred permitholder within fifty air miles of Tropical has requested these operating dates. Respondents have not granted the request.
Tropical Park contends that by failing to act on its application by March 15, 1983, or at any time thereafter[2], respondents have initiated statutory automatic award provisions and must automatically issue Tropical its operating license for the dates requested. Tropical cites section 550.011(2), Fla. Stat. (Supp. 1982), which provides, in pertinent part:
Except as otherwise provided in this chapter, each permitholder shall request days of operation, which request shall include the number of scheduled performances within each day of operation, by January 15 of each year; and the Florida Pari-mutuel Commission shall consider and take action on each request no later *1331 than March 15 of each year... . If the Florida Pari-mutuel Commission does not take action on the request for days of operation and number of performances by March 15 in any year, then the days that are requested that are not in conflict with the operating days of another permitholder within 50 air miles shall be automatically awarded.
The winter racing operating dates are authorized under section 550.081(1), Fla. Stat. (Supp. 1982), which establishes a winter thoroughbred horse racing season consisting of 150 days, divided into three 50-day periods.[3]
Respondents argue that Tropical is not entitled to the requested relief accorded by the automatic award provision of section 550.011(2) because: (1) section 550.011(2) does not apply to thoroughbred horse racing in South Florida since these operating dates are specifically awarded under section 550.081. Furthermore, because section 550.081 has been declared unconstitutional by the Fourth District Court of Appeal in Hialeah, Inc. v. Gulfstream Park Racing Association, 428 So.2d 312 (Fla. 4th DCA 1983) [hereinafter referred to as Hialeah], there is presently no authority for awarding winter racing dates; (2) the dates requested by Tropical conflict with the operating dates of Flagler Greyhound and Miami Jai-Alai, two other permitholders within 50 air miles of Tropical.
We find that respondents have failed to state a legal defense. In reaching this conclusion we first address the issue concerning the constitutionality of section 550.081. This court must determine whether the decision of the Fourth District Court of Appeal in Hialeah renders section 550.081 invalid in its entirety or only in part. In Hialeah, the court specifically held that the authority of the Pari-mutuel Commission to allocate winter racing periods to competing tracks, in the absence of legislative standards or guidelines in section 550.081(3)[4] constituted an unlawful delegation of legislative power to the executive branch. The entire opinion dealt exclusively with the unlawful delegation of authority contained in subsection 3 of section 550.081. There was no discussion concerning the validity of the 150-day winter racing season created and authorized by section 550.081. The court's finding of statutory infirmity was thus directed to the legislature's failure to provide the Commission with standards or guidelines for allocating the three winter racing periods under section 550.081(3). The narrow focus of the Hialeah holding, condemning only the unbridled discretion of the Commission under subsection 3, was noted in a recent decision in which this court stated:
Section 550.081, Florida Statutes (1981) has been declared unconstitutional, prospectively, insofar as it delegates power to the Pari-Mutuel Commission to allocate racing periods to competing tracks without legislative guidelines.

*1332 State ex rel. Calder Race Course, Inc. v. Department of Professional Business Regulation, 429 So.2d 103 (Fla. 3d DCA 1983) (emphasis added). It is therefore clear that the court in Hialeah did not condemn section 550.081 in its entirety, but merely invalidated the allocation provision of subsection 3.
We next consider whether the remainder of the statute can stand with the objectionable portion stricken. It is well settled that the unconstitutionality of a portion of a statute will not necessarily render the entire act void. Cramp v. Board of Public Instruction of Orange Co., 137 So.2d 828 (Fla. 1962); State v. Calhoun County, 127 Fla. 304, 170 So. 883 (1936). See also Simmons v. Division of Pari-Mutuel Wagering, 407 So.2d 269 (Fla. 3d DCA 1981), aff'd. 412 So.2d 357 (Fla. 1982). One of the factors that must be considered in determining whether the valid provisions of a statute are "separable" from portions declared invalid is the existence of a "separability" clause. See A. Sutherland, Statutes and Statutory Construction, § 44.08 (4th ed. 1973).
The legislative history of section 550.081 reveals that a "severability clause" was included in both the original legislative act adopting section 550.081 in 1947 as Chapter 23728, Laws of Florida,[5] and in the 1975 revision of section 550.081 established in Chapter 75-43, Laws of Florida (1975), which provides:
Section 11. If any provision of this act or the application thereof to any person or circumstance is held invalid, it is the legislative intent that the invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared severable.
In Florida, severability clauses have been viewed as evidence of legislative intent that an act be separable. See McSween v. State Live Stock Sanitary Board of Florida, 97 Fla. 749, 122 So. 239 (1929). Thus, the severability clause contained in the present act manifests the legislature's intent that the valid portions of section 550.081 can be effectuated independently of those parts deemed void.
Looking at the substance of section 550.081, we conclude that the invalidity of the unlawfully delegated apportionment provision of subsection 3 does not require us to declare all of section 550.081 invalid. Applying the severability test of Cramp[6], see also Simmons, we find that the invalid allocation provision contained in subsection 3 can be separated from the remaining valid portions of section 550.081. The avowed legislative purpose of section 550.081 is to generate tax revenue for the state. See Ch. 75-43, Laws of Fla. (1975); see also Gulfstream Park Racing Association, Inc. v. Board of Business Regulation, 318 So.2d 458 (Fla. 1st DCA 1975) [hereinafter cited as Gulfstream]. This statutory objective and the state's best interests can most effectively be served when permitholders are permitted to operate. Furthermore, the legislative policy of maximizing tax revenue can best be accomplished if competing permitholders are licensed to operate during the separate and distinct winter racing periods established under section 550.081(1). See Id. In this regard, the court in Gulfstream at 460, n. 1 noted:
It has been tacitly assumed by all concerned that no part of § 550.081 except the preferential allocation of racing periods was affected by the Supreme Court's 1971 decision. The concept of dividing the winter season into three exclusive *1333 racing periods for Hialeah, Gulfstream and Tropical Park (Calder) still prevails under the legislative finding `that two or more horse race tracks located within a radius of one hundred air miles of each other cannot operate on the same racing days without endangering the tax revenue derived therefrom and the general welfare of the public.' Sec. 550.081(1), F.S. 1973. That policy, though unstated, continues in the 1975 amendment to § 550.081. Ch. 75-43, § 7, Fla.Laws 1975.
A denial of Tropical's license to operate during the first winter racing period, dates not requested by the other two thoroughbred permitholders, would undermine the legislative policy of maximizing revenue for the state.
An examination of section 550.081's legislative history and its interpretation by the courts over the last twelve years reveals, moreover, that the allocation provision of subsection 3, in its various forms, is the only portion of the statute that has been the subject of attack. See, e.g., Hialeah Race Course, Inc. v. Board of Business Regulation, 270 So.2d 366 (Fla. 1972); Gulfstream Park Racing Association, Inc. v. Division of Pari-Mutuel Wagering, 253 So.2d 429 (Fla. 1971); Hialeah Race Course, Inc. v. Gulfstream Park Racing Association, Inc., 245 So.2d 625 (Fla. 1971); Hialeah, Inc. v. Gulfstream Park Racing Association, 428 So.2d 312 (Fla. 4th DCA 1983); Hialeah Park, Inc. v. Board of Business Regulation, 339 So.2d 287 (Fla. 3d DCA 1976); Gulfstream Park Racing Association, Inc. v. Board of Business Regulation, 318 So.2d 458 (Fla. 1st DCA 1975).
The legislative purpose expressed in the valid portions of section 550.081 can be accomplished independently of the invalid allocation provision. The mandatory "automatic award" language of section 550.011 requires the Commission to grant Tropical Park its exclusive license to operate during the first period of winter racing established under section 550.081(1). In this manner the statutory objective of raising revenue for the state through the operation of winter thoroughbred racing can be accomplished without reference to the invalid allocation provision contained in section 550.081(3). It is apparent, therefore, that the invalid allocation provision contained in subsection 3 is separable in substance from the statute's valid provision, and permits the conclusion that the legislature would have passed one provision without the other. See, e.g., Gulfstream.
Respondents further contend that Tropical Park is not entitled to relief under section 550.011 because its request is in conflict with the operating dates of two other permitholders, a dog track and a jai alai fronton, located within 50 air miles of Tropical. This argument is clearly without merit. The statutory scheme encompassed in Chapter 550 indicates that the legislature intended to treat separately different types of permitholders, e.g., dog tracks, horse tracks, jai alai frontons. The statutory objective in treating the different kinds of permitholders separately is to prevent competition within a particular group. See Miami Beach Kennel Club, Inc. v. Board of Business Regulation, 265 So.2d 373 (Fla. 3d DCA 1972). Tropical's request for the first period of winter racing does not conflict with the requested operating dates of any other thoroughbred permitholder.
Finding respondents' other contentions devoid of merit, this court holds that Tropical Park is entitled to be awarded its license to operate during the first period of the winter racing season, from November 11, 1983 through January 7, 1984.
The writ of mandamus is granted.
NOTES
[1] This court's jurisdiction is based on Fla.R. App.P. 9.030(b) and 9.100(b).
[2] In a pending Dade County Circuit Court case no. 82-252026, Tropical Park stipulated with Hialeah and Gulfstream (the two other winter thoroughbred race tracks), the Division and the Commission that the Commission would not consider awarding operating dates until after April 15, 1983. This stipulation operated as an extension of time for action by the Commission, and not as a waiver of statutory rights and duties set forth under section 550.011(2).
[3] Section 550.081(1) provides, in pertinent part:

When there are three or more winter thoroughbred horse racing permitholders located within a 35-mile radius of each other, an annual winter thoroughbred racing season consisting of 150 racing days, exclusive of Sundays, is authorized. Each winter permitholder is authorized to operate in only one of the three periods of racing hereinafter set out, and all racing days shall be run consecutively. Each racing period is established as follows:
(a) The first period shall consist of 50 racing days. No charity or scholarship racing days may be operated during the first period.
(b) The second period shall consist of 50 racing days. No charity or scholarship racing days may be operated during the second period.
(c) The third period shall commence upon the completion of the second period and shall consist of 50 racing days. No charity or scholarship racing days may be operated during the third period.
[4] Section 550.081(3) provides:

On or before January 4 of each year, each of the winter thoroughbred horserace permitholders shall file in writing with the Florida Pari-mutuel Commission its request for the racing period the permitholder wishes to operate. On or before February 15 of each year, the Division of Pari-mutuel Wagering shall issue an annual license authorizing the permitholder to conduct a racing meet during the period granted by the Florida Pari-mutuel Commission.
[5] Section 8 of Ch. 23728, Laws of Florida (1947) provides: "If any part of this Act is declared unconstitutional, it shall not affect any remaining part hereof."
[6] The severability test delineated in Cramp, 137 So.2d at 830 provides:

When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.