668 So.2d 259 (1996)
WAL-MART STORES, INC. and Claims Management, Inc., Appellants,
v.
Linda LIGGON, Appellee.
No. 95-257.
District Court of Appeal of Florida, First District.
February 15, 1996.
*261 William H. Rogner of Hurley & Rogner, P.A., Orlando, for appellants.
Barry Silber, Pensacola, for appellee.
KAHN, Judge.
On October 10, 1991, the claimant, Linda Liggon, sustained a compensable injury when she was involved in a motor vehicle accident while on company business for the employer, Wal-Mart Stores, Inc. At the time of the accident, Liggon was forty-eight years old. Following her injury, Liggon was treated by Dr. Fletcher Eyster, a neurosurgeon, who determined that Liggon had a cervical injury at the fifth and sixth vertebral levels. Dr. Eyster attempted to surgically repair the damaged discs by using a bone graft; however, the bone graft did not fuse Liggon's cervical spine as expected.
On December 7, 1992, Dr. Marcus Schmitz, also a neurosurgeon, performed additional surgery, including another fusion. Dr. Schmitz placed Liggon at maximum medical improvement (MMI) as of October 1, 1993, with an 11 percent neurosurgical impairment based on the American Medical Association (AMA) Guidelines for Disability. Dr. Schmitz also believed that Liggon had "significant psychological overlay." Although Dr. Schmitz did not impose specific restrictions himself, he approved sedentary-type job descriptions submitted to him by Wal-Mart and indicated that such approval was based on strict adherence to those descriptions which included the following elements: lifting of no more than five pounds; limited standing alternating with sitting; limited walking; no bending, squatting, kneeling, climbing, pushing or pulling; minimal hand manipulation; no lifting; no carrying; and accommodations for a chair and a telephone headset, if needed.
Liggon requested psychiatric treatment and the E/C sent her to Dr. Theodore Marshall for an independent medical examination (IME). Dr. Marshall apparently[1] diagnosed major depression and chronic pain syndrome. In October 1993, Liggon began treating with Dr. Peter Szmurlo, who practices psychiatry *262 and pain management. According to Dr. Szmurlo, Liggon had developed a depressive disorder and pain syndrome as a result of her accident. Dr. Szmurlo released Liggon to job search status as of March 1, 1994, and placed her at MMI as of July 6, 1994, with a 30 percent psychiatric impairment under the Minnesota Guidelines. Dr. Szmurlo also believed that Liggon required a chair and a headset to return to work, and he encouraged Liggon to return to work assuming the employer would make these accommodations.
Beginning in May 1994, Liggon also received treatment from Dr. Robert Sackheim, a board certified anesthesiologist with expertise in pain management. Dr. Sackheim placed Liggon at MMI as of July 12, 1994, with a 13 percent permanent partial impairment under the AMA Guidelines. Dr. Sackheim opined that Liggon could return to part-time work, four hours per day, but she needed to function at a sedentary level, should have a comfortable chair, and, to minimize movement of her neck, she should use a headset for answering the phone, if required to do so. The restrictions imposed by Dr. Sackheim included: no lifting over five to ten pounds or on a highly repetitive basis; sit and stand as needed; no repetitive bending, squatting, or kneeling; no pushing and pulling heavy items; and no frequent reaching above her head.
The E/C paid benefits to Liggon through November 1, 1993. On April 18, 1994, Liggon filed a Petition for Benefits seeking temporary total disability (TTD) and temporary partial disability (TPD) from March 31, 1993, and continuing. The petition indicates that Liggon reached MMI on October 1, 1993, according to Dr. Schmitz. The pretrial stipulation, filed with the JCC on July 6, 1994, indicates that Liggon was also seeking permanent total disability (PTD) from the date of MMI and continuing. A motion hearing subsequently took place resulting in the entry of a nonfinal order denying the E/C's request for a second IME, and a final hearing occurred on November 21, 1994, before the JCC.
At the final hearing, Liggon testified that Wal-Mart had never offered her a job within her limitations and restrictions. Liggon further testified that, in the fall of 1993, the E/C had sent her a letter advising her of her obligation to do a work search and that she began to do her work search. She indicated that she performed job searches on a "regular daily basis," but none of the prospective employers offered her a job. She also testified that on June 30, 1994, she went to Wal-Mart and inquired about employment within her restrictions. She spoke with Elwin Jones, the store manager, and told Jones she needed a special chair and a head set. According to Liggon, Wal-Mart had offered her a job in the ladies' fitting room, but Jones told her on June 30 that "it was too much of a hassle to provide that equipment." Liggon denied that Jones discussed an alternate job that had become available in the men's fitting room. She further testified that she was aware that her doctor had placed her at MMI as of July 1994 and had indicated that she could go back to work, but that she had not done any job searches and had not made any effort to go back to Wal-Mart after June 30.
Elwin Jones also testified at the hearing. He indicated that he had worked with Gerri Pennachio, a rehabilitation specialist, and Brian Walsh, an assistant manager, in an attempt to place Liggon in a job at Wal-Mart that would accommodate her restrictions. Jones testified that although he had initially thought a position in the ladies' fitting room would be appropriate, he decided prior to June 30 that the men's fitting room job would be "a lot less stressful." He testified that on June 30, when Liggon came to the store, he told her that he wanted to place her in the men's fitting room because she would not have to answer the phone and "it would be a lot easier for her to do." According to Jones, the men's fitting room job is still available, and it is a job all Wal-Mart stores are required to have.
In the order entered December 21, 1994, the JCC found that "the unrebutted evidence clearly indicates the claimant is only able to engage in part-time sedentary work." The JCC determined that Liggon had therefore met her burden of proof under section 440.15(1)(b), Florida Statutes (1991), to show that she is incapable of performing light work on an uninterrupted basis. The JCC *263 also found that, considering her restrictions, the limited work search performed by Liggon was adequate and that, on most occasions, she was under a doctor's orders not to conduct a work search. The JCC further indicated that although evidence of a good faith work search is usually an essential element of proving a PTD claim, "in cases where the injured employee is so physically disabled that a job search would amount to only a futile gesture, a formal work search is unnecessary." The JCC found that the employer's offer of a part-time job as a men's dressing room attendant constituted an offer of sheltered employment. The JCC concluded that Liggon reached MMI from a neurosurgical standpoint on October 1, 1993, with an 11% permanent partial impairment (PPI), and reached psychiatric MMI on July 6, 1994, with a 30% psychiatric PPI. Based on the medical evidence, the JCC awarded TPD from November 1, 1993, through July 6, 1994,[2] and PTD from July 7, 1994, "to date for as long as she is legally entitled to such benefits." The E/C have appealed. Because the JCC erred in awarding PTD benefits, we reverse.

I. IME Request
As a preliminary matter, we note that the JCC erred in denying the E/C's request for a second IME. Specifically, the JCC improperly relied on Roberts v. Ben Hill Griffin, Inc., 629 So.2d 236 (Fla. 1st DCA 1993), for the proposition that the Legislature restricted the scope of an IME to the four situations listed in section 440.13(2)(b), Florida Statutes (1991). That statute contains the following provisions:
The right to conduct an independent medical examination includes, but is not limited to, [1] instances when the authorized treating physician has not provided current medical reports; [2] determining whether over-utilization by a health care provider has occurred; [3] whether a change in health care provider is necessary; or [4] whether treatment is necessary or the employee appears not to be making appropriate progress in recuperation. The employer or carrier has the right to schedule an independent medical examination with a health care provider of its choice, at a reasonable time to assist in determining this status. The health care provider performing the independent medical examination shall not be the health care provider to provide the treatment or followup care, unless the carrier or self-insurer and the employee so agree or unless an emergency exists.
(emphasis added). In Roberts, the JCC granted the E/C's motion for a second IME without first conducting a hearing. 629 So.2d at 237-38. Although the Roberts court noted that "the instant motion does not set forth any of the statutory grounds in support of a second IME, nor indeed any facts in support thereof," the court concluded that "[b]ecause there were no facts in the motion from which the JCC could `scrutinize' the reasonableness of a second IME ..., we find that the failure to hold a hearing on the motion after the notice required by Rule 4.140(a) was not harmless error." Id. at 238. The Roberts court thus based its decision not on a requirement that the E/C set forth one of the statutory grounds in support of an IME, but on the requirement that the JCC have a hearing on the motion to compel, particularly when the motion does not set forth a statutory ground and does not contain *264 any facts regarding the reasonableness of the request. Id.; see Reed v. Reed, 643 So.2d 1180, 1182 (Fla. 1st DCA 1994).
Further, this court has previously determined that the right to an IME is not without limits and section 440.13(2)(b) "seems to impose a `reasonableness' requirement subject to the scrutiny of the JCC." Farm Stores, Inc. v. Fletcher, 621 So.2d 706, 708 (Fla. 1st DCA 1993); see Roberts, 629 So.2d at 238. The E/C's request in this case appears to satisfy this reasonableness test as more than a year would have elapsed between the first and the second IME and Liggon filed the PTD claim following the first IME. Indeed, as the JCC pointed out at the hearing, he had granted IME requests in other cases when there had been such a lapse in time and, were it not for his interpretation of the Roberts case, the E/C "might be entitled ... to have another IME since it's been a year." In addition, contrary to Appellee's argument, an IME physician may render an opinion regarding whether a claimant has reached MMI as well as the extent of the claimant's disability, and the JCC may accept that opinion. See Smith v. Seminole Kraft Corp., 649 So.2d 261, 263 (Fla. 1st DCA 1994) (in reversing TTD award, court noted that IME physician testified that claimant had not yet reached MMI as of date of hearing); Gainesville Coca-Cola v. Young, 632 So.2d 83 (Fla. 1st DCA 1993) (court reversed JCC's order where JCC failed to state reasons for accepting IME physician's impairment rating over that of claimant's treating physicians); Turner v. Carl Blanchard Plastering, 590 So.2d 1025, 1026-27 (Fla. 1st DCA 1991) (court reversed and remanded order where JCC failed to state reasons for accepting opinion of IME physician over that of claimant's treating physician), review denied, 598 So.2d 79 (Fla. 1992). The JCC improperly denied the E/C's request for a second IME based on his erroneous construction of the Roberts case and section 440.13(2)(b). Nonetheless, because on the present record competent substantial evidence does not support the PTD award, no purpose would be served by a remand to, in effect, allow the E/C to present additional evidence. Denial of the second IME was, therefore, harmless.

II. PTD Claim
Regarding permanent total disability, section 440.15(1)(b), Florida Statutes (1991), provides in pertinent part:
[P]ermanent total disability shall be determined in accordance with the facts.... [N]o compensation shall be payable ... if the employee is engaged in, or is physically capable of engaging in, gainful employment; and the burden shall be upon the employee to establish that he is not able uninterruptedly to do even light work available within a 100-mile radius of the injured employee's residence due to physical limitation.
This court has recently explained the ways in which an injured employee may establish a PTD claim:
The burden is upon the employee to establish inability to uninterruptedly do even light work available within a 100 mile radius of the injured employee's residence due to physical limitations. A permanent total disability case may be proven by medical evidence that a claimant is unable to do light work uninterruptedly due to physical limitations. Even without medical restrictions against light work, a claimant can establish entitlement to permanent total disability through evidence of a lengthy yet unsuccessful job search. Entitlement to permanent total disability may be shown as well by a combination of medical proof of a substantial permanent impairment and vocational evidence that a claimant is unemployable.
Herrera v. Hojo Inn Maingate, No. 95-660 ___ So.2d ___ [1996 WL 16566] (Fla. 1st DCA 1996) (citations omitted). "In assessing entitlement to PTD benefits, the court may consider factors such as a claimant's actual physical impairment, work history, education and training, ability to do and obtain other work, and age." Shaw v. Publix Supermkts, Inc., 609 So.2d 683, 685 (Fla. 1st DCA 1992); see Roose & Griffin Landscape Contractors v. Weiss, 558 So.2d 102, 105-06 (Fla. 1st DCA 1990). Once the claimant presents a prima facie case, which the JCC accepts, the E/C must demonstrate that suitable work is *265 available for the claimant. See Loprinzo v. Mald Corp., 429 So.2d 1363, 1365 n. 1 (Fla. 1st DCA 1983). So called "sheltered employment" does not qualify as suitable work, however, as "[s]heltered employment is not gainful employment which would preclude an award of PTD benefits." United States Fidelity & Guar. Ass'n v. Kemp, 658 So.2d 1212, 1214 (Fla. 1st DCA 1995); see Arizona Chemical Corporation v. Hanlon, 605 So.2d 938, 941 (Fla. 1st DCA 1992).

A. Inability to Perform Light Work Uninterruptedly Due to Physical Limitations
In this case, the JCC determined that "the medical evidence regarding the restrictions imposed by her neck injury alone indicate the claimant is unable to engage in gainful employment." The medical evidence presented, i.e., records and testimony of Dr. Schmitz, Dr. Szmurlo, and Dr. Sackheim, indicates that Liggon is capable of part-time sedentary work, as acknowledged by the JCC: "In this case the unrebutted evidence clearly indicates the claimant is only able to engage in part-time sedentary work." The JCC concluded, however, that Liggon had "met her burden under F.S. 440.15(1)(b) of showing that she is incapable of performing even light work on an uninterrupted basis." The JCC explained that although some of the factors set forth in Weiss supported the E/C's contention that Liggon was not PTD, those factors did not "outweigh the overwhelming evidence that the claimant is PTD." In particular, the JCC noted that Liggon's physical and psychiatric impairments and her restriction to part-time sedentary work were sufficient to support a PTD award.
This court has recently reversed a determination, however, that a claimant had satisfied his burden of establishing inability to perform light work by showing that he was capable of only part-time sedentary work. Kemp, 658 So.2d at 1213-14. As the Kemp court explained, ability to undertake part-time sedentary work precludes, rather than supports, an award of PTD:
The JCC held that the claimant had met his burden of establishing that he is incapable of performing even light work on an uninterrupted basis because the claimant is capable of only part-time sedentary work. Relying on the definitions of "sedentary" and "light" work in the United States Department of Labor's Dictionary of Occupational Titles, the JCC opined that "[t]here is no doubt that sedentary level work is more restrictive than anybody's definition of `light' work." The JCC also held that if the claimant had chosen to limit himself to part-time work he would not be entitled to PTD benefits, but that PTD benefits should be awarded when an injury compels someone to accept only part-time employment. These conclusions are incorrect. An inability to engage in any meaningful employment would support the conclusion that one is permanently totally disabled. However, an ability to work part-time contradicts the conclusion that one is totally disabled.... Moreover, the ability to engage in sedentary employment satisfies the statutory prohibition in section 440.15(1)(b) ... against awarding PTD benefits to one who is able to perform light work.

Id. (citations omitted; emphasis added). Therefore, the JCC erred in relying on Liggon's part-time sedentary work restriction as sufficient to support the PTD award.
Further, although Dr. Szmurlo indicated in his deposition that he believed it was "doubtful" that Liggon was capable of engaging in "regular employment," he had released her to resume a work search as of March 1, 1994. He also indicated later in his deposition that he had allowed or encouraged Liggon to return to work, as she was provided with a headset, if needed, and a chair, and to do so would be in her medical best interests. Accordingly, competent substantial evidence does not support the JCC's characterization of Dr. Szmurlo's opinion as "highly unlikely" that Liggon "will ever resume gainful employment."
The JCC erred in finding that Liggon had met her burden under section 440.15(1)(b) of showing that she is incapable of performing even light work on an uninterrupted basis.

*266 B. Lengthy and Exhaustive Job Search
Although the JCC found that the evidence showed Liggon was incapable of performing light work uninterruptedly, the JCC also addressed the adequacy of Liggon's job search:
After her benefits were terminated in November of 1993, the claimant attempted to test the labor market by looking for jobs. On most occasions, the claimant was under doctor's orders not to conduct a work search. Considering the restrictions imposed by her physicians, her limited work search was adequate. In most cases, evidence of a good faith work search is essential proof in a claim for PTD. However, in cases where the injured employee is so physically disabled that a job search would amount to only a futile gesture, a formal work search is unnecessary.
Later in the order, the JCC again noted the medical evidence and determined that Liggon's doctors had excused her from performing a job search for most of the time at issue:
In this case, evidence of a good faith but unsuccessful work search is not an important factor, in light of the medical testimony limiting her to part-time sedentary work. For most of the time she was supposed to conduct a work search, she was excused from doing so by her doctors.
The JCC also determined that "[t]he evidence in this case indicates the claimant has lost the ability to compete in the open labor market for jobs." These determinations, as explained below, are not supported by competent substantial evidence.

1. Excusal of Job Search

As Appellants assert, the record does not indicate that Dr. Sackheim restricted Liggon from performing a job search at any time. Further, according to the record, on January 19, 1994, Dr. Szmurlo restricted Liggon from searching for work for sixty days, and Dr. Szmurlo's progress note dated March 1, 1994, indicates that he released "her back to the job search status as of today's date."
In addition, although Dr. Schmitz never restricted Liggon from performing a job search, he did indicate that, as of October 1, 1993, he did not believe she could return to work based on her subjective complaints. Specifically, Dr. Schmitz's notes contain the following statements:
She did ask today if she will ever return to work. She says the Workmen's Compensation people have asked her about this. She says Comp has been giving her a hard time. She said she had to give a deposition last week. She has already been evaluated by Rehab, has also had a MMPI. Based on her subjective complaints and the amount of pain that she has with any activity, I would believe that she could not return to work. I believe she has reached MMI.
In his notes of December 10, 1993, Dr. Schmitz indicated that Liggon reported to him that the pain and numbness in her arm, together with her ongoing neck problems, had increased so that she could not perform her job searches: "She says it is to the point where she cannot even participate in job search because she couldn't work anyway." The doctor noted that he "cannot find any structural cause [for] her problems." Nevertheless, Dr. Schmitz documented Liggon's subjective complaints regarding her inability to perform her job searches:
Regarding her job search, it is a subjective complaint that she says she hurts too bad to engage in these activities, since I cannot find any objective findings on her testing, however. If the patient says they hurt too bad to do something, I cannot really argue the point. All I can do is document that she says she hurts too bad to engage in these activities.
Despite his repeated documentation of Liggon's subjective complaints of pain, nothing in Dr. Schmitz's notes indicates that he ever restricted her from performing job searches. See Brevard County School Bd. v. King, 378 So.2d 1312, 1313 (Fla. 1st DCA) ("Pain alone does not necessarily indicate a loss of wage earning capacity, nor is it an excuse for not seeking a job."), cert. denied, 388 So.2d 1115 (Fla.1980). Indeed, when questioned at his deposition, Dr. Schmitz testified that he had indicated that Liggon could do sedentary work. Further, Dr. Schmitz's notes dated April 21, 1994, indicate that he approved her return to work, at least as of April 4, 1994.
*267 Therefore, from the evidence in the record, for the period from November 1, 1993, when the E/C terminated Liggon's indemnity benefits, through January 18, 1994, and for the period after March 1, 1994, Liggon was not excused from performing a job search by either Dr. Sackheim or Dr. Szmurlo. In addition, at least as of April 1994, Liggon was not excused by any of her doctors from performing a job search. Accordingly, the JCC erred in determining that for most of the time at issue, i.e., from November 1, 1993, through the date of the hearing in November 1994, Liggon was under doctor's orders not to conduct a work search because, at the most, she was excused for only three months, i.e., January 19 through April 21 of 1994.
Further, because it appears that Liggon performed very few, if any, job searches following her release to work in April 1994, as explained below, competent substantial evidence does not support the JCC's excusal of her job search after that date. See Mason v. Rapid Transp., 470 So.2d 91, 92 (Fla. 1st DCA 1985) (court affirmed denial of TTD benefits because "[c]laimant's failure to make any job search precludes recovery after the date on which he was advised to seek work"). Cf. Bill's Equipment and Rentals v. Teel, 498 So.2d 536, 537 (Fla. 1st DCA 1986) (deputy commissioner did not err in excusing claimant's failure to more actively seek employment where "[t]he record reveals that claimant sought employment commensurate with his work experience and job skills, while the employer made no effort to obtain employment for claimant"); Thompkins & Sons Lawn Spray v. Brooks, 452 So.2d 103, 103-04 (Fla. 1st DCA 1984) (mentally retarded claimant had permanent injury to both legs, preventing him from standing or sitting for more than hour at a time, and during two years between MMI and PTD hearing, claimant attended vocational courses and had interviews with 15 potential employers, four of whom gave him jobs, which he was unable to perform; court found it "unnecessary to decide whether a job search was completely excused because the search actually conducted, although somewhat limited, was adequate considering the claimant's abilities and restrictions"); Drummond v. Plumbing Corp. of Am., 428 So.2d 741, 742-43 (Fla. 1st DCA 1983) (court reversed deputy's finding of no PTD where claimant's doctors agreed that he could not work uninterruptedly at even light work and claimant's minimal job search was sufficient in light of his age, severe physical limitations, and industrial history).

2. Adequacy of Job Search

The record indicates that Liggon only conducted job searches for, at the most, three two-week periods. Specifically, through her attorney, she submitted job search forms for TPD benefits for the periods from December 14, 1993, through December 27, 1993, and December 28, 1993, through January 10, 1994. The record also contains a cover letter referencing a job search from April 14 through April 27, 1994; however, the attached job search form contains dates from March 17 through March 30, 1994.
Further, Liggon testified at the hearing that although she was aware her doctor had placed her at MMI as of July 1994 and had indicated that she could go back to work, she had not done any job searches and had not made any effort to go back to Wal-Mart after June 30. In addition, Jones testified that the part-time job in the men's fitting room at Wal-Mart remained open to Liggon. The record also contains evidence of repeated efforts by Jones and Walsh to set up a work schedule for Liggon at the store during the period from May 17, 1994, through October 21, 1994.
As mentioned by the JCC in the order and as recited above, all of Liggon's doctors believed that she had the ability to work on at least a part-time sedentary basis. Dr. Schmitz had approved, on April 4, 1994, job descriptions for customer representative helper and ladies' fitting room attendant/phone operator. Dr. Schmitz testified that he discussed these jobs with Liggon and, from a medical standpoint, she should be able to perform the jobs. Dr. Schmitz indicated that Liggon could perform such light duty positions for eight hours a day, five days a week, assuming her limitations and restrictions were adhered to, including no lifting in excess of five pounds and accommodations *268 for a headset, if Liggon was required to answer the phone, as well as a chair. In addition, in his deposition taken October 20, 1994, Dr. Schmitz specifically approved the job as men's fitting room monitor. On cross-examination, Dr. Schmitz indicated that based on Liggon's subjective complaints, he believed she would not return to gainful employment; however, based on his previous testimony together with his signatures on the job descriptions and his indication that Liggon can return to work "now" as of April 4, 1994, Dr. Schmitz believed that Liggon had the ability to return to work. See Walt Disney World Co. v. Miller, 644 So.2d 595 (Fla. 1st DCA 1994) (This court reversed JCC's finding of PTD: "Of the physicians relied on by the JCC, none found an objective basis for claimant's pain and none could testify that her pain, whether mental or physical in nature, was the result of injury received in the industrial accident. The expert testimony is that claimant's continuing problems are largely emotional and due to her loss of employment...."); Kyle v. Davis, 435 So.2d 918, 920 (Fla. 1st DCA 1983) ("A claimant's `bare complaints of continued pain so that the claimant feels unable to work' is not a condition that is `readily observable by lay people.' Such evidence is insufficient to override medical testimony to the contrary and to prove inability to work.").
Dr. Sackheim also indicated that Liggon could perform part-time work if provided with the accommodations of a special chair and a headset for answering the phone, if required to do so. Similarly, Dr. Szmurlo approved Liggon's return to work as long as she was provided with a headset, if needed, and a chair. Dr. Szmurlo indicated that Liggon had told him that when she spoke with Jones in June 1994, Jones told her that they could not provide the requested accommodations; however, Dr. Szmurlo testified that he had not heard that information from anyone else other than Liggon. Dr. Szmurlo further testified that he had allowed or encouraged her to return to work and to do so would be in her medical best interests.
In addition, the two rehabilitation specialists involved in the case, Richard Gilmartin and Gerri Pennachio, reviewed the medical reports, were aware of Liggon's restrictions, and believed that Liggon could return to work. The letter to Liggon's attorney from Gilmartin concludes that "Ms. Liggon is feasible for part-time sedentary employment of a restricted nature" and "a number of positions exist which would be consistent with [her] restrictions and fall within the nonexertional capacity of Ms. Liggon." Similarly, Pennachio testified that she "really saw no problem in her return to work." Pennachio identified an available light duty job at Wal-Mart, as a men's fitting room attendant, and indicated that none of Liggon's restrictions would prevent her from doing that type of job.
Therefore, in light of the uncontroverted opinions of each of her doctors, together with those of the rehabilitation specialists, that Liggon can work on at least a part-time sedentary basis, Liggon's minimal work search, contrary to the JCC's findings, is not adequate as a matter of law. See H.S. Camp & Sons v. Flynn, 450 So.2d 577, 579 (Fla. 1st DCA 1984) (court characterized as "lengthy and exhaustive" claimant's three-year job search which proved "completely unsuccessful ... in spite of services from three vocational rehabilitation or placement experts"); Frank's Fine Meats v. Sherman, 443 So.2d 1055, 1056 (Fla. 1st DCA) (where "[t]he only competent substantial medical evidence showed that the claimant was able to work," court determined "[t]here was no competent substantial evidence to support the deputy's finding of PTD and his excusal of a further work search by the claimant"), petition for review denied, 451 So.2d 850 (Fla.1984); King, 378 So.2d at 1313 (where claimant with 10% PPI was released to return to work and doctor "advised her that there was nothing physically preventing her from returning to work," court determined that record did not support finding of PTD and "[t]his is borne out by claimant's refusal to test her employability despite repeated suggestions by her physicians that she return to work"). In addition, because of the consensus that Liggon can work on at least a part-time sedentary basis, competent substantial evidence does not support the JCC's implicit finding that Liggon is so physically disabled that a job search would amount to *269 only a futile gesture. See Kyle, 435 So.2d at 920.
In sum, based on the foregoing, the JCC erred in determining that Liggon was excused from performing a job search for much of the time at issue and in determining that Liggon's job search was adequate. Further, as the employer testified that the men's room fitting job remained available to Liggon on a part-time basis and all the medical evidence indicated that Liggon could perform that job, Liggon did not establish an inability to perform light work uninterruptedly. See Roll v. Sebastian Inlet, 609 So.2d 674, 676 (Fla. 1st DCA 1992) (court affirmed denial of PTD where medical evidence indicated that claimant could perform sedentary occupation and such a job remained available to claimant until shortly before final hearing). Finally, because Liggon did not perform a lengthy and exhaustive job search, the JCC erred in awarding PTD benefits.

C. Availability of Suitable Work/Sheltered Employment
Even assuming, however, that Liggon made a prima facie showing that she is unable to do light work uninterruptedly due to physical limitations or that she conducted an adequate job search (or was excused from doing so), the E/C proved that a job Liggon could perform was available.
Elwin Jones, the store manager of the Wal-Mart where Liggon worked at the time of her accident, testified at the hearing that he had worked with Gerri Pennachio in attempting to place Liggon in a job with Wal-Mart that fit her restrictions. Jones explained that the job in the ladies' fitting room involved answering the telephone, which would probably be beyond Liggon's restrictions unless Wal-Mart provided her with a headset. He further testified that he had offered Liggon a job in the men's fitting room, where the work was less demanding, and scheduled her hours:
Q What do you do in the men's fitting room? What jobs do you have?
A We have three men's fitting rooms. It's about twenty-five percent of the activity in the ladies' wear fitting as far as customers wanting to try on clothes. We were going to provide a suitable chair for her to sit in and she could sit and stand intermittently whenever she felt necessary and therethe other activities with the clothes and everything, it's just way less physical demand on her.
Q Would it require her to count garments that people take in and out to make sure they weren't shoplifting?
A Yes.
Q Would it require her to take a key and unlock fitting room doors?
A Yes.
Q And were you willing to provide her with a chair with a cushion that she could sit in when she needed it?
A Yes.
Q Was there any requirement that she answer the phone in that particular job?
A There is no phone in there.
Q Was that job offered to Ms. Liggon?
A Yes.
Q And did you place her on the schedule on a limited basis pending her return?
A We put her on a schedule, the hours she said she could work three hours a day and that's the schedule we had given her.
Q That's what she said she could work?
A Yes.
Jones testified that he told Liggon about the men's fitting room job on June 30, 1994, when Liggon came to the store and that the job was still available. Jones also indicated that he had not heard from Liggon since the June discussion. Finally, Jones testified that the men's fitting room job offered to Liggon was a job found in every Wal-Mart and had not been created for Liggon specifically or workers' compensation claimants generally:
Q Now, Wal-Mart has a variety of jobs, men's fitting room attendant, ladies' fitting room attendant, door greeter, door exiter, things of that nature which are very light duty. Are those just made up for Workers' Comp claimants to have or are those positions which are found in every store nationwide as far as you know?
A They are structured jobs.
* * * * * *

*270 Q What do you mean by structured jobs?
A Those are jobs that are required for us to have in Wal-Mart stores to perform our business.
Q And if you did not have Ms. Liggon performing these tasks you would have to have somebody else performing these tasks; is that correct?
A Yes.
The testimony of rehabilitation counselor Gerri Pennachio supports that of Jones. In particular, Pennachio testified that she was hired by Wal-Mart to provide vocational assistance to Liggon and that she had met with Jones or Brian Walsh to identify available positions. At first, they had identified three possible light duty positions: (1) customer service representative, (2) ladies' fitting room monitor, and (3) men's fitting room monitor. Pennachio testified that these three jobs exist in all Wal-Mart stores and similar jobs exist in K-mart stores:
Q These various positions that you've discussed, do you find that these positions are available or at least exist in all the Wal-Mart stores that you work with?
A Yes.
Q And approximately how many Wal-Mart stores do you think you've been in over the past five years?
A Over a hundred.
Q And are these positions there just for injured Workers' Compensation claimants or are they manned by people who are not injured ifif they don't have somebody who is injured in that position?
A They're manned by anyone. They hire for these positions.
Q And do you have any knowledge that that other stores similar to Wal-Mart such as Target or K-mart, whether or not they have similar type positions?
A The only other one that I'm familiar with is K-mart. I really don't do much with Target. But with K-mart yes, they have the same similar positions.
Pennachio further indicated that Jones first intended to offer Liggon the ladies' fitting room job, but when Pennachio followed up on that job, Jones indicated that the job had been filled and he wanted to switch Liggon to the men's fitting room. Pennachio also described the job in the men's fitting room:
It's basically a ... security type position where they're at the fitting room. The men's fitting room stays locked. So in order to get in you have to have someone open up the door. And basically monitor that door, open it, check and count the clothing that people go in with, the men go in with, the men come out with. Basically a security check.
Pennachio further explained that she had previously placed people in that position and had viewed people performing that job on numerous occasions. Pennachio believed that the job fell within Liggon's restrictions and none of her restrictions would prevent her from performing the job. Pennachio also indicated that if the men's fitting room job involved rehanging and restocking garments, it could be restructured and that she had previously restructured that job. Pennachio testified that making accommodations and tailoring specific jobs for peoples' restrictions and limitations is common practice in the rehabilitation industry and a part of her job. She indicated that she was not proposing to do anything different with Liggon than she does with anyone else she is trying to place back to work.
In addition, Dr. Sackheim and Dr. Schmitz, the two doctors questioned specifically about the job of men's fitting room monitor, both indicated that Liggon could perform that job. Dr. Sackheim signed the job description on September 20, 1994. At his deposition, taken September 29, 1994, Dr. Sackheim indicated that although he had previously approved the job for eight hours per day, upon further reflection, he believed Liggon "could only handle part-time work." Dr. Sackheim testified that a reasonable course would be to have Liggon try to work, with the accommodations of a special chair and a headset, for four hours a day. Dr. Sackheim explained that, concerning the special chair, Liggon needs a chair with a cushion and preferably a back"[j]ust something for a little support, nothing extravagant is needed." According to Dr. Sackheim, if Liggon "can tolerate it, working is always better."
*271 When shown the job description, Dr. Schmitz also indicated that Liggon should be able to perform the job as a men's fitting room monitor. Finally, although Dr. Szmurlo was not questioned specifically about the men's fitting room job, he had approved Liggon's return to work as long as she was provided with a headset, if needed, and a chair. Dr. Szmurlo further testified that he had allowed or encouraged Liggon to return to work and to do so would be in her medical best interests.
Regarding the offered employment as a men's fitting room attendant, the JCC made the following findings:
In this case, the employer presented evidence that a job offer of part-time sedentary work was made to the claimant.... There is little doubt that the position of men's room attendant, as modified for the claimant, constitutes sheltered employment.[[3]] Although Wal-Mart stores use dressing room monitors, the modifications, i.e., getting someone else to rehang garments and the soft padded chair, indicate the job was specially created for her under the advice of the rehabilitation counselor. Since the claimant is restricted to part-time work for only 3 hours per day, the employee has, in effect, regulated her own hours. Although there was no evidence presented on the question, one suspects the employer would not keep such an employee on the job if they were functioning at the same level as the claimant. It is doubtful if the employer would hire an additional employee to do the job if the claimant in this case ceased her employment. An offer of sheltered employment does not meet the employer's burden under F.S. 440.15(1)(a) to demonstrate the claimant is capable of engaging in gainful employment.
The sheltered employment doctrine does not have a life of its own. Rather, it merely serves to vindicate the legislatively imposed parameters of permanent and total disability. See Southern Bell Tel. & Tel. Co. v. Bell, 167 So.2d 844, 846-47 (Fla.1964); see also New Wales Chems., Inc. v. Parks, 518 So.2d 360, 363 (Fla. 1st DCA 1987) (rehabilitation benefits). If an employer creates a job for an employee merely as a litigation tactic in a workers' compensation case, such a job cannot be said to constitute "gainful employment" as that term is used in section 440.15(1)(b), Florida Statutes. See Shaw, 609 So.2d at 686 ("Sheltered employment is not a substitute for payment of benefits properly due under the provisions of chapter 440."). Reasonable job modification for the purpose of accommodating an injured or partially disabled employee will not, however, place the job outside of the definition of gainful employment. In point of fact, pervasive federal law now requires employers to make reasonable accommodations for their disabled employees. See 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."), (b)(5)(A) ("As used in subsection (a) of this section, the term `discriminate' includes... not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee...") (1990).
The determination that a particular job is sheltered employment is, like many other matters that arise in workers' compensation cases, a largely factual issue. See Bell, 167 So.2d at 846 (deputy's finding of sheltered employment not supported by competent substantial evidence); Kraft, Inc. v. Hood, 476 So.2d 302 (Fla. 1st DCA 1985) (competent substantial evidence supports deputy's finding that employment was sheltered); Swanigan v. Dobbs House, 442 So.2d 1026, 1027 (Fla. 1st DCA 1983) (essentially factual issues decided by deputy will be affirmed if supported by competent substantial evidence). In the present case, however, the only evidence that spoke to the point demonstrates that the men's fitting room job was *272 not created for Liggon and that the modifications needed to accommodate her were not unusual or novel. As evidenced by the testimony of Jones and Pennachio, outlined above, such jobs exist in all Wal-Marts, Wal-Mart hires for this position, and this light duty job had not been specially created for Liggon or any other workers' compensation claimant. The only modifications mentioned consisted of the provision of a chair and the transfer of one of the job duties, i.e., rehanging clothes, to another person working in that department.[4]
Moreover, the factual situation in this case is clearly distinguishable from that in Shaw, where the employer allowed the claimant to work at her own pace putting price stickers on bakery containers, with no established quotas, and allowed flexible arrival and departure times and periodic rest breaks. 609 So.2d at 684. In Shaw, the employer also offered to change room temperature, to place claimant in separate room, and to provide a cot to accommodate claimant's needs. Id.; see also Parks, 518 So.2d at 362-63 (where employer attempted to place permanently impaired claimant in light duty job as security guard "with restrictions on his duties commensurate with his physical limitations" and claimant requested vocational training when he became dissatisfied with the security guard job, court determined that "[o]n this record, that job must be characterized as sheltered employment because claimant's duties have been conformed to claimant's limitations to light duty work, and the job pays much more than any similar job as a guard in the community"); Kyle, 435 So.2d at 919-20 (employer provided claimant with sheltered job, within his medical restrictions, counting pipe; no deadlines placed on claimant and a chair was moved around the pipe yard so that claimant could rest as often as he desired). Thus, under the case law, the two modifications in this case do not warrant classification of the men's fitting room job as an offer of sheltered employment. Indeed, according to Pennachio's testimony, she had restructured the job in the past for other Wal-Mart employees and could do the same for Liggon. Further, both Pennachio and Jones testified that Wal-Mart hires for this position.
In sum, the testimony of Jones and Pennachio, as outlined above, constitutes the only record evidence, other than the medical testimony and doctor-approved job descriptions, also outlined above, relating to the men's fitting room job and this evidence does not constitute competent substantial evidence to support the JCC's finding that the job of men's fitting room monitor offered to Liggon was sheltered employment. Accordingly, because the E/C met its burden of proving that a job Liggon could perform was available and competent substantial evidence does not support the determination that the men's fitting room job offered to her constituted sheltered employment, the JCC erred in finding to the contrary. See U.S. Foundry & Mfg. Co. v. Serpa, 564 So.2d 559, 561-62 (Fla. 1st DCA 1990) (court reversed PTD finding where claimant refused to attempt job as security guard offered by the employer at first merits hearing, despite doctor's conclusion that he could handle job: "[T]here is no competent substantial medical evidence in the record that claimant could not perform the duties of security guard. Indeed, the medical evidence indicates to the contrary. In addition, claimant made no effort to do the work offered; he merely expressed apprehension about doing it. As such, there is no adequate basis for the PTD finding."); see also Broward County Sheriff's Office v. Williams, 430 So.2d 968, 969 (Fla. 1st DCA 1983).
REVERSED.
BARFIELD, J., concurs.
ZEHMER, C.J., concurs and dissents with written opinion.
ZEHMER, Chief Judge (concurring and dissenting).
I concur in the majority opinion to the extent that it holds that the judge of compensation claims erred in denying the employer and carrier's request for a second IME because the judge erroneously applied a misconstruction of our holding in Roberts v. Ben *273 Hill Griffin, Inc., 629 So.2d 236 (Fla. 1st DCA 1993), in reaching that decision. Whether to grant the requested IME was a matter of discretion lodged with the judge, and normally the standard of appellate review would be whether the ruling constituted an abuse of discretion. In this instance, the judge erred as a matter of law because he failed to apply a rule of discretion in reaching his decision. Hence, I would reverse and remand for further proceedings at which the employer and carrier would be privileged to present the results of an IME. Due to the passage of time, however, the judge should permit both parties to present any additional evidence bearing on the issues that the judge deems appropriate.
I respectfully dissent, however, from the reversal of the award of permanent total disability benefits. First, I find it unnecessary to reach this issue in view of a reversal on the IME issue. But if we must reach the PTD determination, I do not subscribe to the analysis of the law and facts set forth in the majority opinion. I believe the majority has invaded the fact-finding function of the judge below in reaching many of the stated findings of fact supporting its holding. It is my view that the record as a whole contains sufficient competent evidence to support the judge's findings of fact showing that this claimant is permanently and totally disabled within the meaning of the applicable statute. Accordingly, I would not disturb this ruling.
NOTES
[1] Dr. Marshall's IME report is not in the record.
[2] In awarding TPD, the JCC indicated that "[a]ccording to a post-hearing letter from the attorney for the employer, there might have been a stipulation" regarding Liggon's entitlement to TPD benefits and "[j]urisdiction should be reserved to determine the exact stipulation of the parties regarding TPD benefits." Accordingly, in the decretal portion of the order, the JCC indicated that "[j]urisdiction is hereby reserved to determine the exact agreement between the parties regarding which periods of time the claimant would or would not be entitled to such compensation." On October 10, 1995, this court directed Appellants to show cause why, in the absence of a stipulation indicating that any disputes concerning TPD benefits have been completely resolved, the case should not be dismissed as a nonappealable, nonfinal order. In the Response to Notice to Show Cause, filed October 20, 1995, Appellants have indicated that the parties have stipulated to certain TPD benefits and that counsel for Appellee had been contacted and was in agreement. Pursuant to the court's further directive, Appellants filed, on November 13, 1995, a copy of the JCC's Order Approving Stipulation of the Parties Regarding Compensation for Temporary Partial Disability.
[3] These findings suggest that the JCC did not credit Liggon's testimony that Jones never offered her the job.
[4] As Appellants assert in their brief, from Pennachio's testimony, it appears that not all persons working as fitting room attendants have to rehang clothes, only those who work as zoners, and if Liggon worked as a men's fitting room attendant, she would not necessarily have to work as a zoner.