# FIRST DISTRICT COURT OF APPEAL
## STATE OF FLORIDA

———————————————

No. 1D2020-3741

———————————————

GULF MANAGEMENT, INC., and
GALLAGHER BASSETT SERVICES,
INC.,

    Appellants,

    v.

TALMADGE WALL,

    Appellee.

———————————————

On appeal from the Office of the Judges of Compensation Claims.
Mark A. Massey, Judge.

Date of Accident: March 18, 2009.

November 29, 2023

TANENBAUM, J.

Both Gulf Management, Inc. and its servicing agent, Gallagher Basset Services, (collectively referred to herein as Gulf Management) appeal an order of the judge of compensation claims ("JCC") awarding Talmadge Wall permanent total disability benefits ("PTD") under section 440.15(1), Florida Statutes. Gulf Management asserts several grounds for setting aside the order, but essentially, the grounds are variations of a "sufficiency-of-the-evidence" argument. That is, Gulf Management, in several ways, attacks how the JCC considered and weighed the live testimony and other evidence given at the final merits hearing, and it also

contends that the JCC misapplied the so-called "*Blake* methods." *See Blake v. Merck & Co.*, 43 So. 3d 882 (Fla. 1st DCA 2010). We affirm because the JCC's findings of fact have support in substantial evidence found in the record, and his conclusions properly applied the governing statute to those facts. We hasten, though, to highlight two important points in the analysis that follows. One is our role in conducting judicial review of an adjudicative order stemming from a quasi-judicial administrative proceeding like the one had here. The other has to do with the role that the *Blake* methods play in applying section 440.15(1) to the evidence when determining a PTD claim.

I

First, our role. The JCC is an administrative hearing officer vested by the Legislature with quasi-judicial authority and tasked with adjudicating a dispute between an injured worker and the employer over a claim for benefits under chapter 440. *See* §§ 440.192, 440.25, 440.29, 440.33, 440.45, Fla. Stat.; *cf.* Art. V, § 1, Fla. Const. (providing that "administrative officers [] may be granted quasi-judicial power in matters connected with the functions of their office"). As an adjudicator, the JCC conducts a final hearing at which he or she receives and weighs the evidence presented and makes findings of fact material to the dispute. *See* §§ 440.25(4), 440.29, 440.33, Fla. Stat. "[T]he weighing of evidence and judging of the credibility of witnesses . . . are solely the prerogative of the [JCC] as finder of fact." *Strickland v. Fla. A & M Univ.*, 799 So. 2d 276, 278 (Fla. 1st DCA 2001). "It is the hearing officer's function to consider all the evidence presented, resolve conflicts, judge credibility of witnesses, draw permissible inferences from the evidence, and reach ultimate findings of fact based on competent, substantial evidence." *Heifetz v. Dep't of Bus. Regul., Div. of Alcoholic Beverages & Tobacco*, 475 So. 2d 1277, 1281 (Fla. 1st DCA 1985).

By law, we have the authority to review an order of a JCC. *See* § 440.271, Fla. Stat.; *cf.* Art. V, § 4(b)(2), Fla. Const. ("District courts of appeal shall have the power of direct review of administrative action, as prescribed by general law."). This judicial review is still appellate review, and it is limited with respect to the JCC's adjudication of disputed facts.

2

> [W]henever any person . . . may be clothed with authority to hear testimony and *charged* by law with the duty of deciding questions of fact . . . [he] is at least acting in a quasi-judicial capacity and as such fact-finding arbiter his . . . findings are entitled to great weight and should not be reversed unless there is no competent, substantial evidence which supports such findings.

*U.S. Cas. Co. v. Md. Cas. Co.*, 55 So. 2d 741, 744–45 (Fla. 1951). "This is so because [the JCC] is the only person charged with the burden and responsibility of hearing the witnesses and making findings of facts." *Id.* at 744. "The fact-finding arbiter is usually in a better position than the reviewing body to judge the ability, experience and reputation of the various [] witnesses who appear personally before him and to determine the weight which should be given their testimony." *Id.* at 745.

Under our deferential appellate review, then, where the JCC has made "administrative findings" based at least in part on live testimony, we do not consider the evidence anew. Instead, we make a legal assessment of whether someone reasonably could reach the conclusion the JCC did about a certain fact when faced with the evidence submitted. "The general rule is that administrative findings, in order to be upheld by the courts, must be supported by substantial evidence," meaning "there must be evidence which supports a substantial basis of fact from which the fact in issue can be reasonably inferred." *Laney v. Bd. of Pub. Instruction for Orange Cnty.*, 15 So. 2d 748, 753 (Fla. 1943); *see also De Groot v. Sheffield*, 95 So. 2d 912, 916 (Fla. 1957) (explaining that, in the context of an administrative proceeding, "evidence relied upon to sustain the ultimate finding should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached"); *cf. Nelson v. State ex rel. Quigg*, 23 So. 2d 136, 136 (Fla. 1945) ("We have held, and it seems to be an almost universal rule, that the findings of fact made by an administrative board, bureau, or commission, in compliance with law, will not be disturbed on appeal if such findings are sustained by substantial evidence."); *Adams v. Wagner*, 129 So. 2d 129, 131 (Fla. 1961) (same). We look only at whether there was such evidence before the JCC "in character, weight, or amount, as will legally justify the judicial or official action demanded." *Tibbs v.*

*State*, 397 So. 2d 1120, 1123 (Fla. 1981), *aff'd sub nom. Tibbs v. Florida*, 457 U.S. 31 (1982).

In other words, we do not re-weigh the evidence; that is a more subjective task reserved entirely to the fact-finder. *Id.*; *see Catron Beverages, Inc. v. Maynard*, 395 So. 2d 261, 262 n.1 (Fla. 1st DCA 1981) ("Perhaps no principle of appellate review is more universally followed than that which proscribes an appellate court from substituting its judgment for that of the trier of fact on factual issues supported by competent, substantial evidence."). Rather, we will affirm a JCC's findings of fact when they "are supported by competent, substantial evidence even though, had we been the trier of fact, we might have reached an opposite conclusion." *Heifetz*, 475 So. 2d at 1281–82; *cf. Swanigan v. Dobbs House*, 442 So. 2d 1026, 1027 (Fla. 1st DCA 1983) (explaining that even when there is evidence in the record that supports both parties' positions as to the facts, and the "case could have been decided either way, depending on the testimony and evidence accepted and believed by the" JCC, we "do not retry the claim at the appellate level and substitute our judgment for that of the [JCC] on factual issues supported by competent, substantial evidence, and appeals asking us to do so are frivolous"); *see also Howard v. Green's Tractor Co.*, 290 So. 2d 46, 48 (Fla. 1973) (observing the contradictions in evidence and that "the conflict could have been resolved by" the JCC "in a manner opposite from that in which he resolved it" but that the role of an appellate court is not "to re-weigh the evidence to see if we agree with the particular manner in which such conflicts were resolved").

Similarly, on appellate review, we do not consider "whether the record contains evidence which could be interpreted to support the arguments rejected by the JCC." *Frederick v. United Airlines*, 688 So. 2d 412, 414 (Fla. 1st DCA 1997); *see Swanigan*, 442 So. 2d at 1027 ("We *do not* review whether there was competent, substantial evidence to support the claim disallowed by the [JCC]; we only *review whether the record contains competent, substantial evidence to support the [JCC's] order*."); *Mercy Hosp. v. Holmes*, 679 So. 2d 860, 860 (Fla. 1st DCA 1996) ("Once again we remind counsel of the basic premise that the standard of review in worker's compensation cases is whether competent substantial evidence *supports* the decision below, *not* whether it is possible to recite

4

contradictory record evidence which supported the arguments rejected below.").

## II

Now we get to the role of *Blake* in a PTD analysis. Gulf Management's arguments in part treat *Blake* as setting out a rigid, categorical methodology for establishing PTD—as if it sets out three separate and independent ways for doing so, each with its own elements that must be strictly adhered to. To be clear, though, it is section 440.15(1)(b), not *Blake*, that governs how an employee can establish entitlement to PTD benefits. Under that paragraph, unless the employee has suffered one or more of the enumerated injuries, he or she must establish "that he or she is not able to engage in at least sedentary employment, within a 50-mile radius of the employee's residence, due to his or her physical limitation." § 440.15(1)(b), Fla. Stat. (2009).[1] This is a fact question that must be resolved by the JCC based on the evidence presented, as we just discussed above.

The statute does not set out any formulaic test to govern the PTD determination, other than what appears in the text itself. *Blake* is not to the contrary. Instead, it catalogs the different forms of proof that have been accepted as competent, substantial

---

[1] The Legislature enacted this provision in 2003. *See* ch. 2003-412, § 18, 58–59, Laws of Fla. Between 1993 and the 2003 enactment, only catastrophic injuries qualified for PTD. *See* ch. 93-415, § 20, at 118–19, Laws of Fla. Before that, going back to 1979, a claimant could not receive PTD compensation if he or she "is engaged in, or is physically capable of engaging in, gainful employment." Ch. 79-40, § 10, at 228, Laws of Fla. (amending section 440.15(1)(b), Florida Statutes). The claimant had to prove "that he or she is not able uninterruptedly to do even light work due to physical limitation." *Id.* In 1990, the Legislature added a requirement that the work be available within one hundred miles of the claimant's residence. *See* ch. 90-201, § 20, at 934, Laws of Fla. Of course, with the current law, that radius is fifty miles. At all events, before 1979, unless the claimant suffered a specified injury, PTD simply would be "determined in accordance with the facts." § 440.15(1)(b), Fla. Stat. (1977).

evidence supporting a JCC's determination of PTD. These categories of acceptable proof, though, are not mutually exclusive. How could they be? The statutory text anticipates that the claimant is going to have to prove the following: that he cannot work at least in a sedentary job within fifty miles of his residence and that his inability to work is tied to his limitation. The assessment necessarily will be—and has been—a flexible one.

All *Blake* did was bring forward this court's previously cataloguing of the flexible approach allowed to JCCs as to the evidence on which they could rely to determine whether PTD had been proven under the statute. *See Blake*, 43 So. 3d at 883 (looking to *Com. Carrier Corp. v. LaPointe*, 723 So. 2d 912, 916–17 (Fla. 1st DCA 1999), as "instructive" because of the similarities between the pre-1994 version of the statute and the current version, and quoting that decision's "three ways to prove entitlement to PTD benefits"). In applying the pre-1994 version of section 440.15, this court observed the following:

> The cases recognize three ways to prove entitlement to permanent total disability benefits on account of industrial accidents occurring before January 1, 1994: (1) evidence of permanent medical incapacity to perform even light work uninterruptedly; (2) evidence of permanent work-related physical restrictions coupled with an exhaustive but unsuccessful job search; or (3) evidence of permanent work-related physical restrictions that, while not alone totally disabling, do preclude performing light work uninterruptedly, when combined with vocational factors.

*LaPointe*, 723 So. 2d at 916–17 (Fla. 1st DCA 1999) (citing *Herrera v. Hojo Inn Maingate,* 680 So. 2d 439, 440–41 (Fla. 1st DCA 1996), and *Wal–Mart Stores, Inc. v. Liggon,* 668 So. 2d 259 (Fla. 1st DCA 1996)).

*Herrera* before that had merely noted that PTD could "be proven by medical evidence that a claimant is unable to do light work uninterruptedly due to physical limitations," but even if there were not those full restrictions, "evidence of a lengthy yet unsuccessful job search" could suffice. *Id.*, 680 So. 2d at 440 (citations omitted). The court added that a claimant could prove

6

entitlement to PTD compensation through "a combination of medical proof of a substantial permanent impairment and vocational evidence that a claimant is unemployable." *Id.* (citations omitted). This recitation, in turn, was just an overview of the flexible evidentiary approach that already had developed over time under the pre-1993 statute (again, the text of which is similar to the current statute).

In fact, this court early on rejected a rigid requirement that there be medical restrictions against even light work to prove PTD:

> We do not read the terms of the statute to limit permanent total disability compensation to those claimants whose doctors impose medical restrictions against "light work." Such a construction would collide with the basic long-standing statutory definition of disability: an *incapacity to earn* to which a compensable injury contributes. It would also collide with the terms of the 1979 amended provision for permanent total disability above quoted, which restricts such compensation when claimant is "physically capable of ... *gainful* employment." (e.s.) The amended language does clearly emphasize the requirement that such disability shall be causally related not only to the compensable accident and injury but also to the resulting physical limitation.

*H.S. Camp & Sons v. Flynn*, 450 So. 2d 577, 580 (Fla. 1st DCA 1984). Some years later, the court recognized the flexibility set out in *Flynn* by explaining that proof of the claimant's engagement in "a lengthy, exhaustive job search"—to no avail—could serve as an evidentiary substitute for medical evidence that the claimant. *U.S. Foundry & Mfg. Co. v. Serpa*, 564 So. 2d 559, 561 (Fla. 1st DCA 1990). "Where there is no medical evidence that the claimant is unable to work, she is required to make a conscientious effort to return to work before she can establish that she is in fact unable to work." *Id.*

This flexible, holistic approach to PTD broadened further in this court's assessment in *Carter v. City of Venice*, 584 So. 2d 577 (Fla. 1st DCA 1991):

7

[T]he claimant consistently attempted to find suitable employment within his physical limitations, but met with no success. Moreover, the job search evidence was bolstered by the above described uncontradicted testimony of the vocational counselor and the rehabilitation nurse, coupled with the claimant's unsuccessful efforts to return to work for the City of Venice, the subject employer. Given these factors, combined with the obvious difficulties which confront a functionally illiterate 54–year–old man seeking to secure a light, sedentary position, it is clear that claimant's job search satisfied the standard articulated in *Serpa*.

*Id.* at 578.

Around the same time, this court rejected as too inflexible even the requirement that there be proof of "a lengthy and exhaustive work search" in the absence of evidence of total medical restrictions. *Pan Am. Bank v. Glinski*, 584 So. 2d 52, 53 (Fla. 1st DCA 1991). This argument too "misconceive[d] the nature of the proof required to establish the essential statutory elements of that award." *Id.* According to the court, where "the medical testimony established that claimant was suffering from a substantial permanent impairment due to the injury that severely restricted her ability to engage in physical activities," a vocational expert's

opinion as to the claimant's employability in the job market while taking into account her physical limitations, including those imposed by [her physician], was competent substantial evidence sufficient to support a finding that claimant was totally disabled from earning the wages she was receiving at the time of her injury.

*Id.* The court noted that "[t]here simply is no legal requirement that claimant is limited to *either* presenting *medical* testimony that she cannot return to work *or* performing an exhaustive work search before qualifying for permanent total disability benefits." *Id.* at 53–54 (first emphasis supplied). "The combination of the medical proof presented here coupled with the other evidence received by the judge was legally sufficient to support the award in this case." *Id.* at 54.

8

The *Glinski* panel indeed acknowledged that this approach followed on the flexible analysis taken by a prior panel, in *Bill's Equip. & Rentals v. Teel*, 498 So. 2d 536, 537 (Fla. 1st DCA 1986). The former panel noted that "[w]hile there was no specific medical evidence of claimant's total inability to work, the physical restrictions placed on his activities had the effect of eliminating all types of employment within claimant's capacity and for which he would be qualified." *Id.* The court explained its disposition as follows:

> Claimant is hampered by his limited schooling and advanced age, and has no job skills which do not involve repetitive twisting, bending, and lifting more than ten pounds. *The record reveals that claimant sought employment commensurate with his work experience and job skills, while the employer made no effort to obtain employment for claimant.* Based on these facts, the deputy commissioner did not err in excusing claimant's failure to *more actively seek* employment. Where an effort to find employment would be a futile and useless gesture, the deputy may excuse claimant from the requirement of a work search as a predicate for disability benefits.

*Id.* (emphasis supplied).

As we close this part, we note the flexibility given to JCCs under section 440.15(1), as summarized in *Liggon*, the other decision cited by *LaPointe*: "In assessing entitlement to PTD benefits, the court may consider factors such as a claimant's actual physical impairment, work history, education and training, ability to do and obtain other work, and age." *Liggon*, 668 So. 2d at 264 (quoting *Shaw v. Publix Supermarkets, Inc.*, 609 So. 2d 683, 685 (Fla. 1st DCA 1992), which also took a holistic approach to the evidence in assessing the sufficiency of proof in support of PTD).

The enumeration of "three ways" (in *Blake* or *LaPointe*), then, should be treated as guidelines for what a JCC may consider to be sufficient proof to demonstrate PTD under section 440.15(1)(b). When determining a PTD claim, the JCC must consider the overall picture painted by the evidence presented. He may weigh the evidence regarding the employee's efforts at conducting a job search, together with evidence of his injury and disability plus

9

testimony from a vocational expert, and reach a conclusion of whether the employee has established what section 440.15(1)(b) requires.

Our overall point here is that the categories of proof identified in *Blake* for PTD claims should not be read as being restrictive. They are not to operate as separate theories of "recovery," so to speak, with each designated theory carrying its own legal elements that must be proven to prevail on a PTD claim. We reject the appellant's apparent effort to treat the categories restated in *Blake* in this way—which would inappropriately transform these guidelines into extra-statutory elements of proof that must be correctly applied as if they were themselves the law.

## III

With all of this in mind, we look at whether there was competent, substantial evidence to support the JCC's factual findings and his determination that Wall established he qualified for PTD benefits. We note initially that there were several live witnesses, including Wall and both his and Gulf Management's vocational experts. The JCC, then, was in the best position to observe the witnesses and assess the credibility of their testimony. As we said at the top, we cannot touch these assessments on appeal.

The JCC's findings were supported by the following evidence. Wall, a former service consultant at Lexus of Tampa Bay, suffered a compensable work-related injury on March 18, 2009, when he sustained injuries to his head, right arm, and left ankle. Following the accident, Wall received temporary total disability ("TTD") benefits while recovering from surgery on his right hand. He was released to work with restrictions of lifting no more than twenty-five pounds and no climbing in September 2010 and returned to Gulf Management, which was doing business as Lexus of Tampa Bay. At this time, he was placed at maximum medical improvement ("MMI") with a fifteen percent impairment rating.

Wall continued with Lexus of Tampa Bay until July 2016, when he was terminated for attempting to direct customers to services off-site. After his termination, Wall worked a series of jobs in the Tampa Bay area. He worked at Gordon Chevrolet from

10

September 2016 until March 2017, Palm Harbor Chevrolet from July 2018 to September 2018, and Goody's Fleet Solutions from September 2018 until November 2018, when he was terminated following a probationary period. He also ran his own concierge services business from August 2016 until July 2018. Wall has not held employment since leaving Goody's Fleet Solutions in 2018. Due to worsening symptoms from the injury, Wall underwent surgery on his right hand in January 2020. He was placed at MMI on April 20, 2020, with permanent restrictions of lifting no more than 4 pounds with his right arm. No restrictions were placed on his left hand.

Wall has held four different jobs, including self-employment, since his termination from Lexus of Tampa Bay. During these periods of employment, there were also substantial periods of unemployment. Between May 2017 and August 2017, Wall applied for five jobs. In 2019, he applied for one job, at Gator Ford in Seffner. In 2020, Wall did not apply for any jobs. Over the course of four years, Wall applied for a total of six jobs, the majority shortly after his termination. While no records were kept of his job searches, Wall stated he also searched Indeed.com and Monster.com for employment within his field and claimed to have made between 50 and 100 contacts. According to Wall's testimony, he searched for jobs within his previous field of employment, relating to car maintenance and sales. His searches were made without consideration for the types of job he could still perform within his restrictions.

The JCC conceded that Wall's job searches were "on the low side." Yet, the JCC concluded that based on Wall's subsequent employment after termination from Lexus of Tampa Bay, motivation to find work, and good faith attempt to continue looking, he had satisfied the requirements of an exhaustive job search. The JCC admitted that the number of applications was on the "low side" and "out of the 52 months that have transpired since his termination in July 2016, there have been approximately 38 months during which claimant was unemployed. This averages out to 1.3 to 2.6 contacts per month." Based on Wall's search history and scattered employment since termination, the JCC found the number of contacts to be "reasonable and sufficient."

11

The JCC also accepted the testimony of Wall's vocational expert, Rebecca Balter (who testified in person) over that of Gulf Management's expert, John Roberts (who also testified in person). The JCC found Balter's opinion regarding his "employability is both more realistic and more objective," and relied on the "caution and limitations" of Wall's doctors "as to type, capacity and volume especially as it pertains to writing and typing activities." She had considered Wall's restrictions and limitations and conducted a transferable skills analysis. This led her to conclude that due to the accommodations that would have to be made and his limitation in the use of his right hand for writing or computer operation for any extended period, he is unable to compete successfully for work in the open job market in his area.

Notably, Balter considered Wall's online job searches and the fact that Wall previously had secured employment three different times after his termination from Lexus of Tampa Bay, all in the automotive field. According to Balter, though, the type of work that Wall performed in these positions fell outside of his current medical restrictions, because the positions required repetitive and frequent movements and regular typing and writing. Balter accepted the restrictions of Wall's doctor to low-capacity, low-volume work, including a prohibition of lifting more than four pounds. These restrictions, Balter believed, resulted in his inability to engage in even sedentary employment. When asked about potential re-training options, Balter responded that she did not see that option being successful because those positions would require the same accommodations Wall was unlikely to receive in his current field. In addition, Balter noted that in trying to secure employment, Wall would face difficulties relating to his recent absence from the workforce, expired work-related certifications, and inability to have procured more than three jobs in his field.

There is sufficient evidence in the record to support the JCC's determination. The JCC considered all of the evidence together and specified in his compensation order how he weighed and resolved conflicting evidence, where it existed. We are not here to second-guess this. Of course, the JCC, as the trier of fact with live witnesses before him, was entitled to accept Balter's opinion testimony over Roberts's testimony. The JCC, in fact, explained how he made that call. As the supreme court has explained:

The fact-finding arbiter is usually in a better position than the reviewing body to judge the ability, experience and reputation of the various so-called expert witnesses who appear personally before him and to determine the weight which should be given their testimony. One doctor may have a long list of degrees behind his name, while another has but few, However, the latter might, by his demeanor on the witness stand and by his freedom and clarity of expression, disclose a familiarity with the subject under discussion which far exceeds that of the ostensibly better educated theorist.

*U.S. Cas. Co.*, 55 So. 2d at 745 (misspelling corrected).

The JCC also was candid about the weakness of the job-search evidence, characterizing the intensity of the search as "on the low side." It is equally clear to us that even though the JCC tried to keep the job-search and the vocational analyses compartmentalized, the JCC ultimately considered the weaker job-search testimony from Wall with the explanation given by Balter along with her assessment of Wall vocationally. *See GCC Beverages v. Simmons*, 571 So. 2d 59, 60 (Fla. 1st DCA 1990) (explaining that nothing "establishes any absolute number of minimum or average monthly contacts as a threshold requirement for an adequate work search" and that this court has "cautioned against such a mechanical approach, emphasizing instead that the adequacy of a work search is a factual issue which is dependent upon the totality of circumstances, including quality and context as well as number of job contacts, in each case").

We may have reached a different conclusion, as the trier of fact, about whether, under the circumstances, Wall's job search was exhaustive and unsuccessful. There, however, was enough substantial evidence submitted to the JCC about the overall picture and circumstances that Wall was facing—including Balter's testimony—to support the JCC's conclusion, even if the conclusion that Gulf Management urges also finds support in the evidence.

AFFIRMED.

13

M.K. THOMAS and NORDBY, JJ., concur.[2]

———————————————————

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

———————————————————

Tiffany Hawks, MKRS Law, Coral Gables, for Appellants.

Bradley G. Smith and Nicolette E. Tsambis, Smith, Feddeler & Smith, Lakeland, for Appellee.

---

[2] Judges M.K. Thomas and Nordby substituted for Judges Makar and Jay, who were recommissioned as judges of the Fifth District Court of Appeal. Judges Thomas and Nordby have viewed the digital recording of oral argument.